IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | |
|---|---|
| THE STATE OF TEXAS; THE STATE OF LOUISIANA; and THE STATE OF MISSISSIPPI, <br>   *Plaintiffs*, <br><br> v. <br><br> JOSEPH R. BIDEN, in his official capacity as President of the United States; DEPARTMENT OF LABOR; MARTIN J. WALSH, in his official capacity as U.S. Secretary of Labor; JESSICA LOOMAN, in her official capacity as Acting Administrator of the U.S. Department of Labor, Wage & Hour Division, <br>   *Defendants*. | No. 6:22-cv-4 |

PLAINTIFFS' ORIGINAL COMPLAINT

## I. INTRODUCTION

1. President Biden has attempted to arrogate to himself the authority to impose sweeping changes on American society with little more than the stroke of a pen. In pursuit of partisan political objectives, Defendants are unilaterally attempting to impose a radical policy—a dramatic and rapid increase in the minimum wage for federal contractors—with little apparent regard for the widespread havoc on the economy that will result. And in a stunning display of hubris, Defendants have demonstrated no compunction in using unlawful executive orders to mandate policies that have been considered and rejected by Congress.

2. The minimum wage that must be paid to workers is one of the most singularly impactful economic policies that any government can impose. Congress has repeatedly demonstrated its exclusive control over the minimum wage standards set by the federal government, acting

infrequently and with deliberation. States are no less aware of the economy's sensitivity to any changes in wage regulation, and each State makes its own determination about the economic policies that makes sense for their citizens. Minimum wage stability, and reliance on that stability, have been a pillar of the American economy, and disrupting that stability comes with significant consequences.

3.     Even the federal government, via the Congressional Budget Office, has recognized that changes in the minimum wage can lead to reductions in employment, increased costs of goods, inflation, and decreased consumption. States will be burdened with higher unemployment benefits claims and a deteriorating economy, and young, less educated workers could bear the brunt of this economic disaster. With this knowledge, Congress has repeatedly rejected a $15-per-hour federal minimum wage.

4.     President Biden came to a different conclusion. With full awareness of the negative economic impact of artificially raising the minimum wage, and despite his failure to persuade Congress, President Biden chose to ignore the will of our federal legislators and instead forced a raise in the minimum wage through executive fiat. Through leveraging the disproportionate bargaining power of the federal government, Defendants have decided to coerce federal contractors into abiding by a policy that Congress does not endorse, potentially affecting hundreds of thousands of businesses that employ as much as one-fifth of the entire U.S. labor force.

5.     The States of Texas, Louisiana, and Mississippi and their residents will suffer significant hardship if this unlawful mandate is allowed to stand. With assistance from the Department of Labor, President Biden dictatorially imposed the very policy that Congress twice rejected and that has detrimental ramifications of which he is well aware. The Plaintiff States respectfully request

that this Court intervene to restore the rule of law and put an end to Defendants' abuse of their authority.

## II.   PARTIES

6.      The State of Texas is a sovereign State of the United States of America.

7.      The State of Louisiana is a sovereign State of the United States of America.

8.      The State of Mississippi is a sovereign State of the United States of America.

9.      Defendant Joseph R. Biden is the President of the United States. President Biden is sued in his official capacity.

10.     Defendant United States Department of Labor (DOL) is a federal agency.

11.     Defendant United States Department of Labor, Wage & Hour Division is a component of the Department of Labor.

12.     Defendant Martin J. Walsh is the Secretary of Labor. Secretary Walsh is sued in his official capacity.

13.     Defendant Jessica Looman is the acting head of the United States Department of Labor's Wage and Hour Division. Defendant Acting Administrator Looman is sued in her official capacity.

## III.   JURISDICTION AND VENUE

14.     This Court has jurisdiction under 5 U.S.C. §§ 702–703 and 28 U.S.C. §§ 1331, 1346, and 1361.

15.     The Court is authorized to award the requested declaratory and injunctive relief under 5 U.S.C. §§ 702 and 706, 28 U.S.C. § 1361, 2201, and 2202.

16.     Venue is proper within this District pursuant to 28 U.S.C. § 1391(e)(1) because (A) at least one Plaintiff resides in Texas and no real property is involved and (B) "a substantial part of the events or omissions giving rise to the claim occurred" in this District.

## IV.     FACTUAL BACKGROUND

### A.     Congress Denies President Biden's Attempts to Push an Artificial Wage Raise.

17.     In July of 2019, the Congressional Budget Office ("CBO") issued a report indicating that an increase in the minimum wage would lead to a reduction in employment. Congressional Budget Office, *The Effects on Employment & Family Income of Increasing the Federal Minimum Wage* (July 2019), https://www.cbo.gov/system/files/2019-07/CBO-55410-MinimumWage2019.pdf. This report was published contemporaneously with the first of Congress's many failed attempts to raise the federal minimum wage to $15/hour and demonstrated that such an increase would lead to a reduction in employment in two ways. First, higher wages would increase the costs to employers to produce goods, which would be passed to consumers in the form of higher prices, and lead to a reduction in consumers purchasing goods and services. *Id.* at 9. Second, the increased cost of labor would result in a substantial workforce reduction.

18.     When President Biden assumed office, the Biden Administration immediately undertook initiatives to artificially raise the wage floor. On January 26, 2021, members of the House and Senate, supported by President Biden, reintroduced a bill to try for a second time to increase the minimum wage. President Biden took credit for the bill, telling the American people "I put it in," and claiming that "all the economics show that if you do that the whole economy rises." *Biden says "no need" for Trump to still receive intel briefings*, CBS NEWS, https://www.cbsnews.com/news/biden-trump-intelligence-briefings/ (last visited Feb. 10, 2022).

19.     But another CBO Report issued in February 2021 made clear that the economy and individual livelihoods would still be detrimentally impacted by an artificial raise. Congressional Budget Office, *The Budgetary Effects of the Raise the Wage Act of 2021* (February 2021), https://www.cbo.gov/system/files/2021-02/56975-Minimum-Wage.pdf.  According to that report, "[e]mployment would be reduced by 1.4 million workers" and that number "could be much higher." *Id.* at 8–9. Those workers would remain "jobless" into and beyond 2025 with "young, less educated people" disproportionately pushed out of the labor market permanently. "Spending for unemployment compensation would increase under the bill because more workers would be unemployed." Moreover, "[h]igher wages would increase the cost to employers of producing goods and services. Employers would pass some of those increased costs on to consumers in the form of higher prices, and those higher prices, in turn, would lead consumers to purchase fewer goods and services[.]" The "cumulative budget deficit over the 2021–2031 period would increase by $54 billion," from its current $3.0 trillion. *Id.*; Congressional Budget Office, *Budget*, https://www.cbo.gov/topics/budget (last visited Feb. 10, 2022).

20.     The Biden Administration ignored this thoroughly researched prediction of economic destruction and pushed Congress for several months to mandate higher wages into existence. These attempts ultimately failed when a bill setting the minimum wage to $15/hour failed to pass the Senate in March 2021. Emily Cochrane, Catie *Edmondson, Minimum wage increase fails as 7 Democrats vote against the measure*, The New York Times, https://www.nytimes.com/2021/03/05/us/minimum-wage-senate.html (last visited Feb. 10, 2022).

**B.**     **The Imposition of EO 14026 and Wage Mandate on Plaintiff States.**

21.     Following his failed attempts to convince Congress to legislatively increase the minimum wage for all Americans, on April 27, 2021, President Biden issued Executive Order 14026, *Increasing the Minimum Wage for Federal Contractors* ("EO 14026"), raising the previous wage floor for federal contractors first set forth by President Obama in Executive Order 13658 and later through rulemaking by the Department of Labor at 29 C.F.R. §§ 10.5(a), 10.24(a). EO 14026 increased the wage floor from $10.10/hour to $15/hour ("EO 14026"). Exec. Order No. 14026, 86 Fed. Reg. 22,835 (April 27, 2021).

22.     In addition to increasing the wage floor, EO 14026 also revoked a 2018 exemption to the $10.10/hour minimum wage for contracts entered into "in connection with seasonal recreational services or seasonal recreational equipment rental." EO 14026 also announced the end of employers' ability to take a tip credit towards their minimum wage obligations for tipped workers beginning in 2024. No explanation whatsoever was offered in EO 14026 for these two changes.

23.     The EO delegates to the Secretary of Labor the authority to issue regulations to "implement the requirements of this order." 86 Fed. Reg. 22,836. The Department of Labor subsequently established standards and procedures for implementing and enforcing EO 14026 ("Wage Mandate") on November 23, 2021. 86 Fed. Reg. 67,126. The EO also requires the Federal Acquisition Regulatory Council to amend the Federal Acquisition Regulation ("FAR") within 60 days of the Secretary's promulgation of regulations. 86 Fed. Reg. 22,836.

24.     On November 23, 2021, the Department of Labor issued its final rule (the "Wage Mandate") in accordance with the directives of EO 14026. 86 Fed. Reg. 67,126. The Wage Mandate implements the minimum wage requirements set out in EO 14026 for federal contractors,

effective January 30, 2022. 86 Fed. Reg. 67,126. The Wage Mandate requires federal "contractors" (as defined broadly by the Wage Mandate) to pay employees a minimum wage of $15 per hour and overtime wages if employees work more than 40 hours per week. *Id.* at 67,227. The minimum wage amount is subject to yearly increases determined by the Department of Labor. *Id.*

25.     The Wage Mandate is promulgated under the directive of EO 14026 and cites the Federal Property and Administrative Services Act ("Procurement Act"), 40 U.S.C. §§ 101, 121, as its legal authority. *Id.* at 67,129.

26.     Despite being issued pursuant to the Procurement Act, the Wage Mandate is not limited to contracts for goods and services. Rather, it broadly applies to all "contract-like instruments," including "lease agreements" and "licenses, permits, or other types of agreement." *Id.* at 67,227. It covers not just organizations that are contractors in the conventional sense, but essentially anyone doing any kind of business with the federal government, such as licensees or permitees. *Id.* at 67,134–36.

27.     The Department of Labor estimates the Wage Mandate affects more than 500,000 private firms, or one-fifth of the entire U.S. workforce. *Id.* at 67,195. The Department of Labor estimates that the Wage Mandate will result in "transfers of income from employers to employees in the form of higher wage rates" in the amount of "$1.7 billion per year over 10 years." *Id.* at 67,194. In addition to these transfers, the Department of Labor estimates average direct employer costs of $2.4 million, comprised of regulatory familiarization costs and implementation costs. *Id.*

28.     The Department of Labor acknowledges that, with respect to traditional procurement contracts, costs to the employer from the increased minimum wage will likely pass through to the

government itself, thereby increasing government expenditures. *Id.* at 67,206.

29.     With respect to non-procurement contracts, the Department of Labor acknowledges that such employers would not be able to pass the associated costs through to the government, meaning the costs would either be passed on to consumers or would lead to companies going out of business. *Id.* at 67,152–53.

30.     The alleged improved economy and efficiency—the lynchpin of the Wage Mandate's stated justification—was not quantified by the Department of Labor. *Id.* at 67,212. In fact, the Department of Labor did not present any direct evidence whatsoever on how contractor minimum wages impacted procurement economy and efficiency, in spite of the fact that six years had elapsed since the imposition of the prior federal contractor minimum wage in 2015. *Id.*

31.     Instead, the evidence that the Department of Labor relied upon as supporting its claimed benefits was demonstrably inapposite: it relied on literature that (1) addressed *voluntary* wage increases made by firms, (2) lacked any direct connection to the $15/hour actual wage being imposed, (3) had no context with government contracting, and (4) focused largely on one trade—the restaurant industry. *Id.*

32.     In many cases, the Department of Labor acknowledged that the literature to which it cites contained studies reaching results contrary to those supporting the Wage Mandate, yet the Wage Mandate itself barely discusses those contrary studies. *Id.* at 67,214. The Department of Labor did not at all attempt to explain why firms had, to date, failed to implement higher wages given these alleged benefits.

33.     The Department of Labor also considered and relied on benefits, such as reduced poverty and income inequality, with absolutely no relationship to the stated purpose of increasing economy

and efficiency in government contracting. *Id.* at 67,214–15.

34.     Ultimately, the Department of Labor did not provide any substantive justification for anything in the Wage Mandate. For example, the Department of Labor did not explain its decision to reverse course entirely for the outdoors recreation industry, did not provide any justification for phasing out the tip credit, and provided no reasoning whatsoever for its chosen $15/hour wage (the very same rate the Administration proposed and the Senate decisively rejected).

35.     The Department of Labor also failed to consider alternatives to any of the measures adopted in the Wage Mandate and completely ignored any reliance interests that might have existed based on the previous wage rates.

36.     The Department of Labor's analysis of the benefits of the Wage Mandate was perfunctory, and no attempt was made whatsoever to compare benefits to costs, to evaluate the effect of billions of dollars in transfers, or to consider how the increased wage might have different impacts in different regions or industries.

37.     Plaintiff States file this suit to vindicate their sovereign, quasi-sovereign, and proprietary interests.

38.     Arms of the Plaintiff States routinely contract with the federal government.

39.     Many agencies, state-funded universities, subdivisions, and other arms of the Plaintiff States are purportedly covered by the Wage Mandate, including Sheriffs, law enforcement agencies, and other state agencies with employees who perform traditional governmental functions. *See also Kentucky v. Biden*, 23 F.4th 585, 2022 WL 43178, at *5 (6th Cir. 2022) (holding that states had standing to challenge federal contractor vaccine mandate because "they and their state agencies are themselves federal contractors that will become subject to the contractor

mandate but for the district court's injunction" and because "state universities, state departments of health, and jails reliant on the states' coffers all contract extensively with the federal government."). On information and belief, many pay wages to some employees that are less than $15/hour.

40.     These arms, agencies, and subdivisions of the Plaintiff States expect to continue pursuing government contracts in the future. *See Kentucky*, 2022 WL 43178, at *5 (an argument that states lack standing to challenge federal contractor vaccine mandate "inexplicably discounts the virtual certainty that states will either bid on new federal contracts or renew existing ones. By engaging in such prolific federal contracting, the federal government has engendered substantial state reliance interests in securing future contracts. It is unreasonable, given those reliance interests, to expect states or their agencies to disavow their prior history of contracting and to decline to seek future such opportunities. And that point only underscores the states' injury.").

41.     Moreover, as a result of increasing the minimum wage to $15/hour, the CBO predicts increased spending for the Children's Health Insurance Program ("CHIP"), which is jointly funded by the both the federal government and the states. *The Budgetary Effects of the Raise and Wage Act of 2021*, Congressional Budget Office, https://www.cbo.gov/system/files/2021-02/56975-Minimum-Wage.pdf (last visited Feb. 10, 2022). The CBO also predicts spending for unemployment compensation will increase "because more workers [will] be unemployed." *Id.*

42.     The Wage Mandate harms Texas' sovereignty and its citizens in numerous ways.

43.     Over 200 individual state-funded universities in Texas are federal contractors, and their total prime contract value in fiscal year 2021 was approximately $128 million. Fiscal Year 2021

subcontracts with Texas universities and medical colleges total approximately $174 million.[1] On information and belief, one of more of those universities pays wages less than $15/hour for some workers.

44.     Texas has a variety of outdoors activities on the roughly 3,231,198 acres of federal lands in the State. *Federal Land Ownership: Overview & Data*, CONGRESSIONAL RESEARCH SERVICE, https://sgp.fas.org/crs/misc/R42346.pdf (last visited Feb. 10, 2022). Texas is home to nearly two dozen National Parks and National Wildlife Reserves where entities contract to participate and offer recreational services such as camping, guiding, birding, sightseeing, hiking, fishing, and hunting. *See Texas*, NAT'L PARK SERVICE, https://www.nps.gov/state/tx/index.htm (last visited Feb. 10, 2022). In 2020 alone, over 5.9 million Texans and others visited these National Park sand National Wildlife Reserves, generating over $328 million in revenue. *Refuge List by State*, U.S. FISH & WILDLIFE SERVICES, https://www.fws.gov/refuges/profiles/ByState.cfm?state=TX (last visited Feb. 10, 2022).

45.     As of January 1, 2022, Texas has a minimum wage of $7.25/hr, pursuant to the Texas Minimum Wage Act and FLSA. The Wage Mandate displaces and preempts this minimum for many employers.

46.     Texas permits employers to take a tip credit (between $2.13 and $5.12/hr). *Minimum Wages for Tipped Employees*, U.S. Dep't of Labor, https://www.dol.gov/agencies/whd/state/minimum-wage/tipped (last visited Feb. 10, 2022). The Wage Mandate will, over the next two years, displace and preempt this tip credit for many employers.

---

[1]     Data available from https://www.usaspending.gov/. USA Spending, https://www.usaspending.gov/search (last visited Feb. 9, 2022).

47.    The Wage Mandate thus purports to inflict sovereign injury upon Texas, which has set its own minimum wage policies within its borders. *See Kentucky*, 2022 WL 43178, at *9 ("The contractor mandate thus likely implicates states' power to make and enforce policies and regulations.").

48.    Even for employers that exclusively pay wages in excess of $15/hour, they will incur costs to ensure compliance with the Wage Mandate. That will include record-keeping costs and costs incurred to adjust for inflation adjustments made each year.

49.    The Wage Mandate will also, as Defendants are well aware, unavoidably require many businesses to dismiss employees, particularly low-wage employees, or pass the increased costs of retaining those employees onto Texas consumers. This will inevitably result in increased unemployment, inflation, or both, which will irreparably and substantially harm Texas and its individual citizens. The increased unemployment will likely increase the burden on Texas' public assistance funds, and it will inflict economic disruption on Texas' economy as a whole. This is a "predictable effect of Government action on the decisions" made by Defendants. *Dep't of Comm. v. New York*, 139 S. Ct. 2551, 2566 (2019).

50.    The Wage Mandate also harms Mississippi's sovereignty and its citizens in numerous ways.

51.    State-funded universities in Mississippi qualify as federal contractors under the Wage Mandate, and on information and belief pay wages less than $15/hour for some workers.

52.    Mississippi has a variety of outdoors activities on the roughly 1,523,573 acres of federal lands in the State.

53.     As of January 1, 2022, Mississippi has a minimum wage of $7.25/hr, pursuant to FLSA. The Wage Mandate displaces and preempts this minimum for many employers.

54.     Mississippi permits employers to take a tip credit of $2.13/hr. *Minimum Wages for Tipped Employees*, Wage and Hour Division, U.S. Department of Labor, https://www.dol.gov/agencies/whd/state/minimum-wage/tipped (last visited Feb. 9, 2022). The Wage Mandate will, over the next two years, displace and preempt this tip credit for many employers.

55.     Even for employers that exclusively pay wages in excess of $15/hour, they will incur costs to ensure compliance with the Wage Mandate. That will include record-keeping costs and costs incurred to accommodate for inflation adjustments made each year.

56.     The Wage Mandate will also, as Defendants are well aware, unavoidably require many businesses to dismiss employees, particularly low-wage employees, or pass the increased costs of retaining those employees onto Mississippi consumers. This inevitable result of an increase in unemployment, inflation or both will irreparably and substantially harm Mississippi and its individual citizens. The increased unemployment will likely increase the burden on Mississippi's public assistance funds, and it will inflict economic disruption on Mississippi's economy as a whole. This is a "predictable effect of Government action on the decisions" made by Defendants. Dep't of Com. v. New York, 139 S. Ct. 2551, 2566 (2019).

## V.     LEGAL BACKGROUND

57.     In a blatant disregard of the obvious economic and financial impacts that artificially raising the minimum wage will have on individuals, companies, and the Plaintiff States, the Biden

Administration has, once again, dictated its policy proposals without any regard to its lack of authority to do so. Defendants have run afoul of federal law in many respects, as described below.

## A.     The Federal Procurement Act

58.     Federal contracting and procurement is an arcane area of law that is difficult to navigate, and Defendants have weaponized that complexity.

59.     The purpose of the Procurement Act, adopted by Congress in 1949, "is to provide the Federal Government with an economical and efficient system for" procurement. 40 U.S.C. § 101. "The text of the Procurement Act and its legislative history indicate that Congress was troubled by the absence of central management that could coordinate the entire government's procurement activities in an efficient and economical manner." *Chamber of Comm. of U.S. v. Reich*, 74 F.3d 1322, 1333 (D.C. Cir. 1996) (citation omitted). 29. The legislative history of the Procurement Act is replete with references to the need for an "efficient, businesslike system of property management." *Id*. at 1333 (citation omitted). The Procurement Act authorizes the President to "prescribe policies and directives that the President considers necessary to carry out" the Act but requires that such policies prescribed by the President "be consistent with" the Act. 40 U.S.C. § 121(a).

60.     Such policies, and regulations established pursuant to them, are not valid unless there is a "nexus between the regulation and some delegation of the requisite legislative authority by Congress," and "the reviewing court [must] reasonably be able to conclude that the grant of authority contemplates the regulations issued." *Chrysler Corp. v. Brown*, 441 U.S. 281, 304, 308 (1979). Congress did not authorize the President to issue orders with the force or effect of law, as, for example, it authorized the GSA Administrator to do. Compare 40 U.S.C. § 121(a) ("prescribe

polices and directives"), with *id.* § 121(c) ("prescribe regulations"); *see also Sosa v. Alvarez-Machain*, 542 U.S. 692, 711 n.9 (2004) ("[W]hen the legislature uses certain language in one part of the statute and different language in another, the court assumes different meanings were intended.").

61.     No nexus exists when the President prescribes policies that are "too attenuated to allow a reviewing court to find the requisite connection between procurement costs and social objectives." *Liberty Mut. Ins. Co. v. Friedman*, 639 F.2d 164, 171 (4th Cir. 1981). Nor does a nexus exist when such policies are imposed on subcontractors, who have "no direct connection to federal procurement" and do "not lie 'reasonably within the contemplation of' the Procurement Act." *Id.* at 171–72.

62.     The Procurement Act does not give the President "unlimited authority to make decisions he believes will likely result in savings to the government . . . the procurement power must be exercised consistently with the structure and purposes of the statute that delegates that power." *Reich*, 74 F.3d at 1330–31.

**B.     The Federal Acquisition Regulation**

63.     Problems with continuity and coordination among the many federal agencies prompted Congress to direct the Office of Federal Procurement Policy ("OFPP"), an office within the Office of Management and Budget ("OMB"), to "issue policy directives . . . for the purpose of promoting the development and implementation of [a] uniform procurement system," with the concurrence of the OMB Director. Under the policy directive of the Administrator of the OFPP, in 1983 the Department of Defense, General Services Administration, and NASA jointly promulgated the first version of the Federal Acquisition Regulation ("FAR").

64.     In 1988, Congress established the FAR Council "to assist in the direction and coordination of [g]overnment-wide procurement policy and [g]overnment-wide procurement regulatory activities in the [f]ederal government." 41 U.S.C. § 1302(a). The FAR Council consists of the OFPP Administrator, Secretary of Defense, the Administrator of NASA, and the GSA Administrator. 41 U.S.C. § 1302(b). Subject to limited exceptions the FAR Council has the exclusive authority to issue "a single [g]overnment-wide procurement regulation." 41 U.S.C. § 1303(a)(1); *see also* 41 U.S.C. § 1302(a). Importantly, no other agency is authorized to issue government-wide procurement regulations. 41 U.S.C. § 1303(a)(1).

**C.     The Major Questions Doctrine**

65.     Courts will not assume that Congress has assigned to Executive Branch questions of "deep economic and political significance" unless Congress has done so expressly. *See King v. Burwell*, 576 U.S. 473, 486 (2015); *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000). By the federal government's own estimates, the Wage Mandate will affect hundreds of thousands of individuals directly and indirectly, with far-reaching economic impacts.

66.     The Supreme Court has unequivocally stated: "We expect Congress to speak clearly when authorizing an agency to exercise powers of vast economic and political significance." *Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 141 S. Ct. 2485, 2489 (2021) (quoting *Utility Air Regulatory Grp. v. EPA*, 573 U.S. 302, 324 (2014)).

67.     The Supreme Court's "precedents require Congress to enact exceedingly clear language if it wishes to significantly alter the balance between federal and state power and the power of the Government over private property." *Id.* The authority to set minimum wages in the national economy is one that Congress has historically always exercised and reserved to itself.

68.     The Procurement Act contains no language authorizing the President to issue and impose mandatory nationwide minimum wage raises. Despite this lack of any Congressional authorization to do so, Defendants imposed the Wage Mandate at the detriment of the Plaintiff States' economies and their citizens' welfare.

**D.     Administrative Procedure Act**

69.     The Administrative Procedure Act ("APA") provides for judicial review of agency action. *See* 5 U.S.C. § 701 *et seq*.

70.     Under the APA, a court must "hold unlawful and set aside agency action" that is "arbitrary and capricious." *See* 5 U.S.C. § 706(2)(A). "[A]gency action" is defined as "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." *Id.* § 551(13). An agency "rule" is defined as "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency." *Id.* § 551(4).

71.     The APA waives the federal government's sovereign immunity from injunctive relief. 5 U.S.C. § 702. And courts have read the APA "as creating a cause of action, rather than merely providing that plaintiffs with preexisting rights in law or equity may sue agencies to vindicate those rights." *Kentucky*, 2022 WL 43178, at *11. This ability to bring a cause of action under the APA is one that both the State and individuals possess. *Gov't of Manitoba v. Bernhardt*, 923 F.3d 173, 181 (D.C. Cir. 2019) ("There is little doubt that a State qualifies as a 'person' under the APA.").

72.     An agency action is arbitrary or capricious if it fails to "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

73.     "When an agency changes its position, it must (1) display awareness that it is changing position, (2) show the new policy is permissible under the statute, (3) believe the new policy is better, and (4) provide good reasons for the new policy." *Ctr. for Biological Diversity v. Haaland*, 998 F.3d 1061, 1067 (9th Cir. 2021) (cleaned up). Furthermore, agencies must provide "a reasoned explanation for disregarding facts and circumstances that underlay or were engendered by the prior policy." *Id.* (cleaned up). Courts should conduct a "searching and careful" analysis of the agency's decision-making process and may not supply a reasoned basis for the agency's decision when the agency itself failed to provide one. *Id.*

74.     As set forth below, the Wage Mandate is "arbitrary [and] capricious" and "not in accordance with law." 5 U.S.C. § 706(2).

**E.     Non-Delegation Doctrine**

75.     Article I of the Constitution vests "[a]ll legislative Powers" in Congress. U.S. Const. art. 1, § 1, cl. 1. "The nondelegation doctrine is rooted in the principle of separation of powers that underlies our tripartite system of Government." *Mistretta v. United States*, 488 U.S. 361, 371 (1989). Thus, the "fundamental precept of the delegation doctrine is that the lawmaking function belongs to Congress . . . and may not be conveyed to another branch or entity." *Loving v. United States*, 517 U.S. 748, 758 (1996). As such, '"the integrity and maintenance of the system of government ordained by the Constitution's mandate that Congress generally cannot delegate its legislative power to another Branch." *Mistretta*, 488 U.S. at 371–72 (quoting *Field v. Clark,* 143

U.S. 649, 692 (1892)); *see also Wayman v. Southard*, 23 U.S. (10 Wheat.) 1, 42-43 (1825) (Congress may not transfer to another branch "powers which are strictly and exclusively legislative.").

76.      Applying these principles, a delegation challenge requires a determination of a "constitutional question": whether the executive order has impermissibly "delegated legislative power." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 472 (2001).

**F.      Federal Wage Statutes**

77.      A host of federal statutes govern minimum and fair wages expressly—unlike the Procurement Act, which does not address minimum wage rates at all. Many of these statutes are dedicated specifically to the question of compensation of workers on federal contracts.

78.      Enacted in 1938, the Fair Labor Standards Act (FLSA) requires nearly all employers in the United States to pay a minimum wage and overtime to covered nonexempt employees. 29 U.S.C. § 201 *et seq.*

79.      The current minimum wage under the FLSA is $7.25 per hour. 29 U.S.C. § 206(a)(1)(C). Overtime at time-and-a-half is required after 40 hours of work in a workweek. 29 U.S.C. § 207(a)(2)(C).

80.      The FLSA also entitles employers to take a tip credit toward their minimum wage obligation for tipped employees equal to the difference between the required cash wage ($2.13) and the federal minimum wage. 29 U.S.C. § 203(m).

81.      That credit reflects Congress's determination that it is appropriate to offset minimum wage requirements by a tip credit (which the Wage Mandate contravenes).

82.      The FLSA governs the wages paid to state employees. *See, e.g.*, 29 U.S.C. § 203(e)(2)(C) (defining "employee" expressly to include individuals employed "by a State, political subdivision

of a State, or an interstate governmental agency"). While the FLSA only sets a "floor" for the minimum wage, it recognizes the States' authority to set their minimum wages at any rate higher than the figure in the FLSA or maintain the FLSA rate. 29 U.S.C. § 218(a).

83.     The FLSA also necessarily recognizes the States' authority to maintain a minimum wage rate equal to that set by the FLSA. *See id.* This provision "makes clear Congressional intent not to disturb traditional exercise of states' police powers with respect to wages and hours more generous than federal standards" *Pac. Merch. Shipping Ass'n v. Aubry*, 918 F.2d 1409, 1421 (9th Cir. 1990).

84.     The Davis-Bacon and Related Acts apply to any federal government contract in excess of $2,000 for the construction, alteration, or repair of public buildings or public works and requires that employers pay at least the locally prevailing wages. *See* Fact Sheet #66: The Davis Bacon and Related Acts (DBRA), Wage & Hour Division, https://www.dol.gov/sites/dolgov/files/WHD/legacy/files/whdfs66.pdf (discussing 29 U.S.C. § 3141, *et seq.*).

85.     The McNamara-O'Hara Service Contract Act ("SCA") covers contracts in excess of $2,500 entered into by federal agencies that have as their principal purpose furnishing services in the United States. The SCA states, among other things, that such contracts must pay at least locally prevailing wages. *See* Fact Sheet #67: The McNamara-O'Hara Service Contract Act (SCA), Wage & Hour Division, https://www.dol.gov/sites/dolgov/files/WHD/legacy/files/whdfs67.pdf (discussing 41 U.S.C. § 351, *et seq.*).

86.     The Walsh-Healey Public Contracts Act ("PCA") applies to contracts in excess of $15,000 for the manufacturing or furnishing of materials, supplies, articles, or equipment to the federal government and sets forth minimum wage, maximum hours, and safety and health standards for

such contracts. *See Walsh-Healey Public Contracts Acct*, Wage & Hour Division, https://www.dol.gov/agencies/whd/government-contracts/pca (discussing 41 U.S.C. § 35).

87. All of these enactments provide compelling evidence that Congress intended to reserve for itself authority to set minimal wage policies, particularly in the federal contracting sphere.

88. Texas sets minimum wage rates equal to that of the FLSA. The Texas Minimum Wage Act requires employers to pay each employee "the federal minimum wage under Section 6, Fair Labor Standards Act of 1938 (29 USC § 206)." Tex. Labor Code § 62.051; *see also id.* § 62.052 (determining wages of tipped employees based on the FLSA).

89. The Wage Mandate circumvents Congress' authority to promulgate a minimum wage and commandeers Congress' authority to amend the FLSA if it so chooses. The Wage Mandate purports to override or effectively amend the FLSA, potentially implicating Texas' minimum wage policy.

90. If left unchecked, the Wage Mandate could put "substantial pressure on [Texas] to change [its] laws.". *Texas v. United States*, 809 F.3d 134, 153 (5th Cir. 2015).

## VI.   CLAIMS FOR RELIEF

91. Plaintiff States expressly incorporates the allegations of each paragraph of this Complaint in the following counts. To the extent there is any perceived inconsistency, Plaintiff States expressly plead each count in the alternative.

## COUNT I
### *Ultra Vires* Acts of the President

92. The purpose of the Procurement Act is to provide the Federal Government with an "economical and efficient system" for, among other things, procuring and supplying property and nonpersonal services. 40 U.S.C. § 101. The Procurement Act permits the President to prescribe

certain policies and directives within the scope of the Act. 40 U.S.C. § 121. The President's power under the Procurement Act is limited to the structure and purposes of the statute that delegates that power—namely, "implement[ing] systems making *the government's* entry into contracts less duplicative and inefficient." *Kentucky*, 2022 WL 43178, at *13 (emphasis in original).

93.     Statements of purpose are not grants of authority; accordingly, the Procurement Act's statement of purpose in § 101 is not a grant of authority to the President.

94.     The President may only issue executive orders that have a nexus to the purposes of the Procurement Act.

95.     Executive Orders issued pursuant to the President's authority under the Procurement Act are subject to judicial review. *Reich*, 74 F.3d at 1330.

96.     When the President exceeds his authority under the Procurement Act, the President acts *ultra vires* and the Executive Order may be deemed unconstitutional.

97.     *Ultra vires* review is available to review whether a government official "violated the Constitution, the statutes under which the challenged action was taken, or other statutes, or did not have statutory authority to take a particular action." *Ancient Coin Collectors Guild v. U.S. Customs & Border Protection*, 801 F. Supp. 2d 383, 406 (D. Md. 2011); *see also Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320 (2015).

98.     "When Congress limits its delegation of power, courts infer (unless the statute clearly directs otherwise) that Congress expects this limitation to be judicially enforced." *Sierra Club v. Trump*, 963 F.3d 874, 891 (9th Cir. 2020), *vacated on other grounds sub nom. Biden v. Sierra Club*, No. 20-138, 2021 WL 2742775 (U.S. July 2, 2021) (cleaned up).

99.     When challenging "the President's statutory authority to issue [an] executive order," if "a

plaintiff is unable to bring his case predicated on either a specific or a general statutory review provision, he may still be able to institute a non-statutory review action." *Id.* at 892 (quoting *Reich*, 74 F.3d at 1327). This is because "the responsibility of determining the limits of statutory grants of authority is a judicial function entrusted to the courts by Congress by the statutes establishing courts and marking their jurisdiction." *Id.* (quoting *Reich*, 74 F.3d at 1327) (cleaned up).

100.    There is no nexus between the Wage Mandate and the Procurement Act's purpose of providing an "economical and efficient system" of procurement. 40 U.S.C. § 101. In fact, the Wage Mandate will have a deleterious effect on economy and efficiency by causing unemployment and increasing the government's labor costs without producing meaningful economic or efficiency benefits.

101.    The Procurement Act does not give the President authority to regulate the minimum compensation of employees of contractors and other entities with "contract-like instruments." The President's authority under the Procurement Act is limited to achieving the specific enumerated purposes of the Procurement Act, none of which include "[r]educ[ing] [p]overty and [i]ncome [i]nequality." 86 Fed. Reg. 67,214.

102.    In addition, under the Procurement Policy Act (and subject to only limited exceptions), the FAR Council has the exclusive authority to issue "a single [g]overnment-wide procurement regulation." 41 U.S.C. § 1303(a)(1). The Procurement Act does not authorize the President to issue government-wide procurement regulations with the force and effect of law. But that is exactly what the President does in EO 14026. The President's Executive Order demands the FAR Council "amend the [FAR] to provide for inclusion in [f]ederal procurement solicitations, contracts, and contract-like instruments" the contract clause discussed in the Executive Order and directs

agencies to implement the contract clause. 86 Fed. Reg. 22,836. The power to amend the FAR—with government-wide effect—rests only with the FAR Council. 41 U.S.C. § 1303(a)(1)–(2). Simply put, the President's arrogation of this authority to himself is unlawful.

103.    Accordingly, President Biden exceeded his authority under the Procurement Act when he promulgated EO 14026. Both EO 14026 and the Wage Mandate must be set aside and enjoined.

## COUNT II
## The Wage Mandate Exceeds Statutory Authority and is Not in Accordance with Law
## 5 U.S.C. § 706

80.    The Wage Mandate is not authorized by the Procurement Act or any other statute.

81.    Under the APA, a court must "hold unlawful and set aside agency action" that is "not in accordance with law" or "in excess of statutory . . . authority, or limitations, or short of statutory right." *See* 5 U.S.C. § 706(2)(A), (C).

82.    For the reasons stated above, the Wage Mandate and EO 14026 conflict with the Procurement Act.

83.    The Wage Mandate and EO 14026 both conflict with existing statutory law that regulates the wages of federal contractors.

84.    The Wage Mandate also conflicts with the FLSA by prohibiting employers from taking a tip credit. *Compare* 86 Fed. Reg. 67,179, *with* 29 U.S.C. § 203(m).

85.    Defendants did not act in accordance with the law and exceeded their statutory authority when they issued the Wage Mandate. Accordingly, the Wage Mandate is unlawful and should be set aside and enjoined.

COUNT **III**
**Arbitrary and Capricious Agency Action**
**5 U.S.C. § 706**

86.     Under the APA, agency action that is "arbitrary [or] capricious" is unlawful and must be

set aside by a court of competent jurisdiction. 5 U.S.C. § 706(2)(A).

87.     Agencies must provide reasoned analysis for their decisions. They must consider and

discuss alternatives and "cogently explain" their choices. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v.*

*State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 48 (1983).

88.     Neither the Wage Mandate nor EO 14026 provide meaningful explanations for a host of

decisions. This alone is fatal to those decisions under the APA.

89.     For example, both the Wage Mandate and EO 14026 ignore the costs of the increase in the

minimum wage and does not meaningfully evaluate the impact of unemployment and

underemployment. The Wage Mandate and EO 14026 ignore the cost of the increase in the

minimum wage and do not evaluate the impact of any transfers.

90.     The Wage Mandate and EO 14026 fail to consider or discuss any alternatives to a $15

minimum wage applicable nationwide, without regard to differences in locale—nor do they

consider any alternative minimum wages that are either higher or lower.

91.     The Wage Mandate and EO 14026 fail to meaningfully analyze its effect on the nation's

economy at a time when the rate of inflation is at a 40-year high.

92.     Moreover, agencies must provide reasoned analysis for changing course. *State Farm*, 463

U.S. at 57. "Because it is generally arbitrary or capricious to depart from a prior policy *sub silentio*,

agencies must typically provide a detailed explanation for contradicting a prior policy, particularly

when the prior policy has engendered serious reliance interests." *BST Holdings, LLC v. Occupational Safety & Health Admin.*, 17 F4th 604, 614 (5th Cir. 2021).

93.     Those affected by changes in rules or policies are entitled, at the least, to consideration of any reliance interests that developed around the since-rejected policy. *See Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913–14 (2019). But neither the Wage Mandate nor EO 14026 adequately justify reversing course on the long-established and relied-upon minimum wage policy set by Congress, and the Plaintiff States' understandable reliance on that wage floor. This applies also to the reversal regarding seasonal recreational activity with reference to the substantial justification provided in EO 13838.

94.     Accordingly, the Wage Mandate and EO 14026 are unlawful and must be set aside and enjoined.

### COUNT IV
### Violation of the U.S. Constitution, Art. I, § 1
### Unconstitutional Delegation of Legislative Power

95.     Pursuant to Article I, § 1 of the U.S. Constitution, "[a]ll legislative powers herein granted shall be vested in a Congress of the United States." Under Article I, § 1, only Congress may engage in lawmaking.

96.     "Congress is not permitted to abdicate or to transfer to others the essential legislative functions with which it is thus vested." *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 529–30 (1935).

97.     The nondelegation doctrine bars Congress from transferring its legislative power to another branch of Government.

98.     The nondelegation doctrine is based on the principle of preserving the separation of

powers. While Congress may delegate power to executive agencies, the statutory delegation must include an intelligible principle to which the delegee "is directed to conform." *J.W. Hampton, Jr. & Co. v. United States*, 276 U.S. 394, 409 (1928).

96.  The President's actions lack the requisite congressional direction to support such a broad delegation of power for two reasons. First, Congress' grant of authority to the President in the Procurement Act does not provide any basis that authorizes the President to implement a national minimum wage by executive order. If the Procurement Act's delegation of authority to the Executive is so broad that it authorizes him to unilaterally impose a national minimum wage as a condition to procurement contracts, then the Procurement Act violates the nondelegation doctrine because it lacks any "intelligible principle" to guide the President's actions. *See A.L.A. Schechter*, 295 U.S. at 529–30. If Congress wanted to delegate this authority to the President through the Procurement Act—and there is no evidence that it did—then Congress' attempt to do so was unconstitutional. The precatory statement of purpose in the Procurement Act is not a clear directive, and the President cannot rely on it to impose a sweeping national mandate.

97.  Second, even if 40 U.S.C. § 121 (a) could be read in such a way as to show that Congress had authorized the President to implement a national minimum wage for federal contractors, Congress did not articulate an intelligible principle authorizing the President to delegate legislative judgment to the Secretary of the Department of Labor. Without explicit congressional authorization, the President's delegation of power in the Executive Order and through the Wage Mandate is itself an unconstitutional delegation of legislative authority which cannot survive constitutional scrutiny.

98.  Moreover, the President cannot delegate authority to implement the Wage Mandate,

*Plaintiffs' Original Complaint*                                                                                           27

because he himself does not possess authority to issue such a mandate.

## COUNT V
### Violation of the U.S. Constitution
### Unconstitutional Exercise of the Spending Power

99.     EO 14026 and the Wage Mandate are unconstitutional conditions on the Plaintiff States' receipt of federal funds.

100.    "The United States Constitution exclusively grants the power of the purse to Congress, not the President." *City and County of San Francisco v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018) (citing U.S. Const. art. I, § 9, cl. 7; U.S. Const. art. I, § 8, cl. 1). Without Congressional authorization, the President has no spending power of his own. *See id.* at 1234–35.

101.    Because President Biden does not have authority to promulgate the requirements of EO 14026 (*see supra* Count I), the President is unlawfully imposing conditions on the receipt of federal funds. *See id.* at 1233–35.

102.    Just as the Procurement Act does not authorize the President to promulgate the requirements of EO 14026, it also does not give the President authority to condition federal contracts on the States surrendering their authority over sovereign interests like their relationships with their public employees. *See also Garcia v. San Antonio Metropolitan Transit Auth.*, 469 U.S. 528 (1985) (holding that *Congress* has authority to implement wage and hour provisions of the FLSA on States' employees). The President cannot arrogate Congress's authority to himself in order to accomplish his preferred policy outcomes by executive fiat.

103.    Because President Biden does not have authority to promulgate the requirements of EO 14026, it follows that Defendants have no authority to issue the Wage Mandate and attach conditions to federal spending. The Executive Branch (of which Defendants are members) cannot

impose conditions on spending that the Constitution would prohibit it from imposing directly. *See Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981).

104.   Finally, even if the Procurement Act did confer authority on the President to promulgate the requirements of EO 14026, the Procurement Act fails to provide clear notice to States that acceptance of federal contracting funds will require them to pay a minimum wage set by the federal government. Only those conditions unambiguously imposed by the statutory text alone may potentially bind the States. *See, e.g., South Dakota v. Dole*, 483 U.S. 203, 207 (1987) ("[I]f Congress desires to condition the States' receipt of federal funds, it must do so unambiguously") (internal quotation marks omitted).

105.   The Wage Mandate exceeds the authority granted to the federal government by the Constitution. Accordingly, the Wage Mandate and EO 14026 are unlawful and should be vacated and enjoined.

## VII.    PRAYER FOR RELIEF

For these reasons, Plaintiff States pray that the Court:

    a.  Declare that the Wage Mandate and its enforcement violates the U.S. Constitution and federal law;

    b.  Declare that Defendants' actions in imposing and enforcing the Wage Mandate against Plaintiff States are *ultra vires*;

    c.  Set aside the Wage Mandate as applied to Plaintiff States;

    d.  Permanently enjoin the Defendants, and any other agency or employee of the Unites States, or any individual working in concert with them, from enforcing the Wage Mandate as to Plaintiff States;

    e.  Award Plaintiff States' costs and reasonable attorneys' fees.

    f.  Award such other relief as the Court deems equitable and just.

Respectfully submitted.

**KEN PAXTON**
Attorney General of Texas

**BRENT WEBSTER**
First Assistant Attorney General

**GRANT DORFMAN**
Deputy First Assistant Attorney General

**SHAWN COWLES**
Deputy Attorney General for Civil  Litigation

**THOMAS A. ALBRIGHT**
Chief, General Litigation Division

*/s/ Christopher D. Hilton*
**CHRISTOPHER D. HILTON**
Attorney-in-Charge
Southern District No. 3029796
Texas Bar No. 24087727
christopher.hilton@oag.texas.gov
Deputy Division Chief
**COURTNEY B. CORBELLO**
Southern District No. 3089117
Texas Bar No. 24097533
courtney.corbello@oag.texas.gov
**AMY SNOW HILTON**
Southern District No. 3350717
Texas Bar No. 24097834
amy.hilton@oag.texas.gov
**HALIE E. DANIELS**
Southern District No. 3380631
Texas Bar No. 24100169
halie.daniels@oag.texas.gov
Assistant Attorneys General

Office of the Attorney General of Texas
General Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548

**COUNSEL FOR STATE OF TEXAS**

**JEFF LANDRY**
Louisiana Attorney General

*/s/Elizabeth B. Murrill*
**ELIZABETH B. MURRILL***
Solicitor General

Louisiana Department Of Justice
1885 N. Third St.
Baton Rouge, LA 70804
(225) 326-6766
murrille@ag.louisiana.gov

**COUNSEL FOR THE STATE OF
LOUISIANA**


**LYNN FITCH**
Attorney General of Mississippi

*/s/ John V. Coghlan*
**JOHN V. COGHLAN***
Deputy Solicitor General

State of Mississippi
Office of the Attorney General
550 High Street
Jackson, MS 39201
Tel: (601) 359-3680

**COUNSEL FOR THE STATE OF
MISSISSIPPI**

*\*Pro Hac Vice admission application forthcoming*