UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | |
|---|---|
| STATE OF TEXAS *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>JOSEPH R. BIDEN *et al.*,<br><br>Defendants. | Civil Case No. 6:22-CV-00004 |

**BRIEF OF AMICI CURIAE ILLINOIS, CALIFORNIA, CONNECTICUT, DELAWARE, THE DISTRICT OF COLUMBIA, MAINE, MARYLAND, MASSACHUSETTS, MICHIGAN, MINNESOTA, NEVADA, NEW JERSEY, NEW MEXICO, NEW YORK, OREGON, PENNSYLVANIA, RHODE ISLAND, VERMONT, AND WASHINGTON IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

Illinois, California, Connecticut, Delaware, the District of Columbia, Maine, Maryland, Massachusetts, Michigan, Minnesota, Nevada, New Jersey, New Mexico, New York, Oregon, Pennsylvania, Rhode Island, Vermont, and Washington (collectively, the "amici States") submit this brief in support of Defendants Joseph R. Biden, in his official capacity as President of the United States; the Department of Labor; Martin J. Walsh, in his official capacity as United States Secretary of Labor; and Jessica Looman, in her official capacity as Acting Administrator of the United States Department of Labor, Wage & Hour Division.

**IDENTITY AND INTEREST OF AMICI STATES**

Amici States have an interest in the public welfare, which includes promoting fair wages and enhancing the well-being and financial security of their residents. That interest is implicated by this case, where Plaintiffs Texas, Louisiana, and Mississippi challenge defendants' authority

1

to direct the inclusion in certain federal contracts of a clause requiring the payment of a $15 minimum hourly wage to employees working on or in connection with the covered contract.

Indeed, amici States are supportive of policies that improve the wages and well-being of their workers while also benefiting employers and consumers. Although amici States have taken different approaches to achieve this goal within their borders, they agree with defendants that increasing wages for workers generates important benefits, including improved services, increased morale and productivity, and reduced poverty and income inequality. Accordingly, many amici States have recently enacted measures increasing the minimum wage for workers within their borders. Indeed, workers in 21 States saw an increase in their minimum wages on January 1, 2022, due either to legislative enactments or inflation adjustments.[1]

Plaintiffs' request to prohibit defendants from raising the minimum wage for federal contract workers, if granted, would run counter to these important interests. Amici States thus urge this court to grant defendants' motion to dismiss and/or for summary judgment and deny plaintiffs' motion for a preliminary injunction.

## SUMMARY OF ARGUMENT

In April 2021, the President exercised his authority under the Federal Property and Administrative Services Act, 40 U.S.C. § 101 *et seq.* ("Procurement Act") to issue an executive order increasing the minimum wage for federal contractors from $10.10 per hour—a rate that had been established in 2014 via executive order and follow-on rulemaking—to $15.00 per hour

---

[1] David Cooper *et al.*, *Twenty-one States Raised Their Minimum Wages on New Year's Day*, Economic Policy Institute (Jan. 6, 2022), https://www.epi.org/blog/ states-minimum-wage-increases-jan-2022/ (Arizona, California, Colorado, Delaware, Illinois, Maine, Maryland, Massachusetts, Michigan, Minnesota, Missouri, Montana, New Jersey, New Mexico, New York, Ohio, Rhode Island, South Dakota, Vermont, Virginia, and Washington).

2

("2021 Order"). In November 2021, DOL promulgated a final rule implementing the 2021 Order ("Federal Contractor Rule").

Plaintiffs in this case challenge defendants' actions on various grounds. Compl. 21-29 (alleging defendants' actions were unlawful under the Procurement Act, Administrative Procedure Act, nondelegation doctrine, and Spending Clause). Plaintiffs allege that the Federal Contractor Rule exceeds defendants' authority under the Procurement Act, largely because, in their view, that Act "contains no language authorizing the President to issue and impose mandatory nationwide minimum wage raises" and therefore, they urge, a contrary reading would run afoul of principles of constitutional avoidance and the so-called "major questions" doctrine. Compl. 16-17, 21-24, 26-28. Plaintiffs also argue that defendants violated the Administrative Procedure Act in promulgating the Federal Contractor Rule, insofar as they failed to "provide meaningful explanations for a host of decisions" and failed to consider the alternatives available to them. Compl. 25-26.

Amici States agree with defendants that these arguments should be rejected because both the 2021 Order and the Federal Contractor Rule were lawful exercises of defendants' authority—in particular, that the President acted well within his authority under the Procurement Act and that DOL validly promulgated the Federal Contractor Rule. Amici States write separately, however, to address two specific aspects of these issues that are relevant to their interests and experience.

First, amici States explain that the major questions doctrine is inapplicable to this case, the crux of which is a challenge to a narrow minimum wage requirement applicable to certain federal contractors. Although raising the minimum wage for this group of workers will yield important benefits, the Rule does not implicate questions of sufficient economic and political

3

significance to warrant application of the major questions doctrine. Nor is there any indication that the doctrine is implicated because of the allegation that the President acted outside of his statutory authority or in tension with past practice; on the contrary, his actions are in line with those taken by his predecessors under the Procurement Act.

Second, amici States refute the notion that the Federal Contractor Rule was arbitrary and capricious because DOL, in the course of its administrative rulemaking process, failed to provide adequate support for the minimum wage increase. As detailed below, DOL provided ample support for the Rule. The studies and analyses that DOL cited in support of its conclusion, moreover, are consistent with state and local experiences with raising wages for their contractors. For these reasons and those outlined by defendants, this court should grant defendants' motion to dismiss or, in the alternative, for summary judgment.

## ARGUMENT

**I.      The major questions doctrine does not apply to this case.**

Application of the major questions doctrine is reserved for a limited set of circumstances that are not implicated by the increase in the minimum wage for federal contractors. Although the precise contours of the doctrine remain undefined, the Supreme Court has applied it only in "extraordinary cases" where an agency has acted on "a question of deep economic and political significance" and where the agency has not identified a basis to believe that Congress delegated such decision-making authority to it. *King v. Burwell*, 576 U.S. 473, 486 (2015) (internal quotations omitted); *see also, e.g., FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159 (2000) (limiting the doctrine to "extraordinary" cases). In other words, the Court invokes this doctrine when an agency has undertaken a major regulatory effort in an area wholly outside of its expertise or in a manner that is incompatible with the underlying statutory delegation of

authority. *E.g.*, *King*, 576 U.S. at 485; *Utility Air Regulatory Grp. v. EPA*, 573 U.S. 302, 324 (2014).

Plaintiffs assert that this Court should apply the major questions doctrine to this case and adopt a narrow view of executive authority under the Procurement Act. In their view, the doctrine is inapplicable because the Procurement Act does not clearly provide the executive branch with the authority to impose a minimum wage for federal contractors and because the question of the appropriate minimum wage "significantly alter[s] the balance between federal and state power and the power of the Government over private property." Compl. 16-17 (quoting *Alabama Ass'n of Realtors v. Dep't of Health & Human Services*, 141 S. Ct. 2485, 2489 (2021)). But plaintiffs are incorrect for several reasons.

At the threshold, application of the major questions doctrine is not warranted because increasing the minimum wage for federal contractors does not constitute "a question of deep economic and political significance." *King*, 576 at 486 (internal quotations omitted). In recent decisions involving this doctrine, the Supreme Court has considered actions to be sufficiently economically and politically significant when they affect millions of Americans and involve the expenditure of billions of dollars annually. *E.g.*, *id.* at 485 (implementation of tax credits under the Patient Protection and Affordable Care Act constitutes a major question, since those tax credits "involv[e] billions of dollars in spending each year and affect[ ] the price of health insurance for millions of people").

As one example, the Supreme Court determined that the evictions moratorium implemented during the Covid-19 pandemic was a matter of "vast economic and political significance" because the moratorium imposed an economic burden of approximately $50 billion and applied to "[a]t least 80% of the country, including between 6 and 17 million tenants at risk

5

of eviction." *Alabama Ass'n of Realtors*, 141 S. Ct. at 2489. Likewise, the Court invoked the doctrine in a case challenging an emergency rule that would have affected 84 million workers by requiring "all employers with at least 100 employees to ensure their workforces are fully vaccinated or show a negative test at least once a week." *Nat'l Fed'n of Indep. Bus. v. Dep't of Labor, Occupational Safety & Health Admin.*, 142 S. Ct. 661, 665 (2022) (internal quotations omitted).

Contrary to plaintiffs' suggestion, the reach of the action challenged in this case is much more modest than any where the Court has applied the major questions doctrine. According to DOL's findings, the Rule's minimum wage increase will affect just 327,300 employees, 86 Fed. Reg. at 67,194, which, at less than .1% of the American population, is a fraction of the individuals affected by the ACA tax credits or the Covid-19 policies. The Supreme Court has never invoked the major questions doctrine on an issue affecting so few Americans.

In terms of economic impact, DOL reported that the Rule would increase wages by $1.7 billion per year for 10 years. *Id.* Even the cumulative effect of the Rule ($17 billion) is meaningfully less than the $50 billion in short-term emergency relief recently recognized by the Supreme Court as sufficient to invoke the major questions doctrine. *Alabama Ass'n of Realtors*, 141 S. Ct. at 2489. Furthermore, the economic estimate provided by DOL, although certainly "significant," is "far below the range that the Office of Management and Budget quantifies to have a measurable effect, in macroeconomic terms, on the gross domestic product"—a number that, according to one court, is ".25% of the GDP, which is $52.3 billion." *Bradford v. U.S. Dep't of Labor*, No. 21-cv-03283-PAB-STV, 2022 WL 204600, at *13 (D. Colo. Jan. 24, 2022) (citing 86 Fed. Reg. 67,224).

Plaintiffs' invocation of the major questions doctrine wholly ignores these findings. As noted, DOL found that the Rule would affect roughly 327,300 employees—roughly 0.2% of the U.S. civilian labor force, which was most recently estimated at over 164 million.[2] Even using DOL's estimate of "potentially affected" employees—i.e., including those workers not likely to be affected by the Rule because they make over $15 per hour—the Rule could conceivably affect only 1.8 million employees, or roughly 1% of the labor force. *See* 86 Fed. Reg. 67,195. Far from imposing "a sweeping national mandate," then, Compl. 27, the Rule affects only a limited number of businesses that choose to perform services for the federal government.

In any event, the major questions doctrine is inapplicable for the additional reason that the executive branch has acted within its delegated statutory authority and in a manner consistent with prior practice. This case is thus unlike those where the Supreme Court has called an agency action into question upon finding that the agency is attempting to regulate in an area where it "has no expertise," *King*, 576 U.S. at 486, or where it cannot identify any statutory or historical precedent for the regulation, *Utility Air*, 573 U.S. at 324. Indeed, in one of the first cases applying this doctrine, the Court rejected the Food and Drug Administration's claim that it could regulate the tobacco industry, where it had never before asserted such statutory authority and, in fact, had previously disclaimed its ability to do so. *Brown & Williamson*, 529 U.S. at 159-60; *see also, e.g.*, *NFIB v. OSHA*, 142 S. Ct. at 666 (noting the "lack of historical precedent") (internal quotations omitted); *King*, 576 U.S. at 486 ("It is especially unlikely that Congress would have delegated this decision to the *IRS*, which has no expertise in crafting health insurance policy of this sort.") (emphasis in original).

---

[2] *See* U.S. Bureau of Labor Stats., *Employment Status of the Civilian Population By Sex And Age* (Apr. 1 2022), https://www.bls.gov/news.release/empsit.t01.htm.

The challenged actions here are distinguishable from those cases. To start, the increase in the minimum wage for federal contractors is clearly authorized by the text of the Procurement Act. Indeed, the Act assigns to the President the authority to implement "policies and directives" that he or she "considers necessary to carry out" the objectives of economy and efficiency in federal procurement. 40 U.S.C. § 121(a). As the D.C. Circuit has recognized, this language reflects congressional intent to bestow "broad-ranging authority" and "flexibility" on the President so that he or she may achieve the goal of providing the government "an economical and efficient system for procurement and supply." *UAW-Labor Emp. & Training Corp. v. Chao*, 325 F.3d 360, 366 (D.C. Cir. 2003) (internal quotations omitted); *see also, e.g., City of Albuquerque v. U.S. Dep't of Interior*, 379 F.3d 901, 914 (10th Cir. 2004) ("Congress chose to utilize a relatively broad delegation of authority in the [Procurement Act]").

Courts have thus upheld a wide range of executive orders issued under the Procurement Act, including those that set price and wage guidelines, *AFL-CIO v. Kahn*, 618 F.2d 784, 792-93 (D.C. Cir.1979); require federal contractors to inform workers of their rights under federal labor laws, *Chao*, 325 F.3d at 366-67; and implement antidiscrimination requirements, *e.g.*, *Contractors Ass'n of Eastern Pa. v. Secretary of Labor*, 442 F.2d 159 (3d Cir. 1971); *Farkas v. Texas Instrument, Inc.*, 375 F.2d 629, 632 n.1 (5th Cir. 1967).

In addition to this broad statutory authority, there is historical precedent for presidents issuing executive orders setting a minimum wage for federal contractors and determining the scope of its protections. In addition to the 2021 Order issued by President Biden, *see* 86 Fed. Reg. 22,835 (Apr. 27, 2021), President Obama issued an executive order establishing a $10.10 minimum wage for federal contractors in 2014, 79 Fed. Reg. 9,851 (Feb. 20, 2014), and President Trump issued an executive order in 2018 that exempted from that minimum-wage

8

requirement certain seasonal recreational providers, 83 Fed. Reg. 25,341 (June 1, 2018). Notably, the 2018 executive order did not cast doubt on the President's authority to set minimum wages for federal contractors; on the contrary, it retained the $10.10 minimum wage and carved out a narrow exemption to its terms. *Id.* Executive orders setting a minimum wage for federal contractors have thus been in place for nearly eight years and over the course of three presidential administrations. Given this precedent and the recognized breadth of the Procurement Act's delegation of authority to the President, this case is unlike those where an agency has issued a regulation based on a claim to have discovered "an unheralded power" in a "long-extant statute." *Utility Air*, 573 U.S. at 324.

Finally, there is no merit to the argument that the executive branch has improperly disrupted the balance of power between the federal government and the States. To be sure, the relationship between federal and state authority can be a relevant factor in the major questions analysis where that balance is "significantly alter[ed]" by executive action. *United States Forest Service v. Cowpasture River Preservation Ass'n*, 140 S. Ct. 1837, 1850 (2020). But the narrow action at issue here—which, as discussed, reflects a proprietary decision affecting only 327,300 employees, 86 Fed. Reg. at 67,194—does not fall within that category.

The primary reason, according to plaintiffs, that the 2021 Order interferes with their state interests is because it prevents States from regulating wages—for both their residents and their own employees—above the federal floor. Compl. 9-13. But under the 2021 Order, the States' ability to protect their residents and workers by regulating wages above the federal floor, remains intact. Indeed, the 2021 Order expressly reserves to the States and localities the ability to enforce "any applicable law or municipal ordinance establishing a minimum wage higher than

9

the minimum age established under this order." 86 Fed. Reg. at 22,835. The 2021 Order thus does not unduly alter the balance of power between federal and state governments in this respect.

## II. DOL's minimum wage increase is amply supported by social science and empirical data.

Plaintiffs are also wrong to assert that the Federal Contractor Rule is arbitrary and capricious because it purportedly increased the minimum wage without explanation. Compl. 25-26. On the contrary, DOL clearly articulated reasoning for implementing a $15.00 minimum wage for federal contractors. Among other findings, DOL concluded that increasing the minimum wage would "generate several important benefits," including "improved government services, increased morale and productivity, reduced turnover, reduced absenteeism, and reduced poverty and income inequality for Federal contract workers." 86 Fed. Reg. at 67,195. DOL also determined that any costs employers would incur would be modest. *Id.* at 67,206-08. Accordingly, this Court should grant defendants' motion to dismiss.

### A. The minimum wage increase provides important benefits to employers, consumers, and employees.

To begin, numerous studies and reports, including those relied on by DOL, have shown that by paying employees higher wages, employers improve the morale, productivity, and performance of employees; reduce turnover; and are able to attract higher quality workers. 86 Fed. Reg. at 67,212-14. And these benefits, in turn, lead to improved services and better consumer experiences. *Id.* Such findings, moreover, are well-documented: Improvements in worker efficiency, recruitment, and retention have been found across many different sectors, including air travel, policing, retail, manufacturing, and construction.[3] Given the consistency of

---

[3] *E.g.*, Paul K. Sonn & Tsedeye Gebreselassie, The Road To Responsible Contracting, National Employment Law Project at 3-4 (2009), https://s27147.pcdn.co/wp-content/uploads/2015/03/responsiblecontracting2009.pdf (collecting studies); Justin Wolfers & Jan Zilinsky, *Higher Wages for*

these findings, as DOL noted, there is "no reason to believe that the trends found in the literature do not also apply to the Federal contract worker community." 86 Fed. Reg. at 67,213.

As one example, a recent study of minimum wage increases in nursing homes provided "direct evidence" linking those increases to improved worker performance and efficiency in this context. *Id.* The study found that "higher minimum wages induc[ed] better performance among current workers" and improved the service quality through increased retention."[4] Among other indicators of better performance, the study noted improvements in the health and safety of the nursing home residents, including fewer health inspection violations and deaths each year.[5] In fact, the study estimates that in 2013 (one of the years it examined), there would have been approximately 15,000 fewer nursing home deaths had comparable wage increases been implemented in nursing homes across the country.[6]

There is also evidence that these benefits remain well beyond the initial wage increase: according to a 2019 report, "wage raises increase productivity for up to two years after the wage increase." 86 Fed. Reg. at 67,213. The nursing home study similarly reported that health and safety improvements—in particular, the lower rate of deaths—persisted after the initial increase.[7]

Increased wages, like those in the Federal Contractor Rule, can also facilitate retention and recruitment. 86 Fed. Reg. at 67,213. According to a recent study cited by DOL, improved

---

*Low-Income Workers Lead to Higher Productivity* (Jan. 13, 2015), https://www.piie.com/blogs/realtime-economic-issues-watch/higher-wages-low-income-workers-lead-higher-productivity?p=4700 (same).

[4] Krista Ruffini, *Worker Earnings, Service Quality, and Firm Profitability: Evidence from Nursing Homes and Minimum Wage Reforms*, at 3, 9, 15 (Apr. 25, 2022), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3830657.

[5] *Id.* at 2.

[6] *Id.* at 20.

[7] *Id.* at 2.

wages "at a Fortune 500 company found that a 1 percent wage increase" resulted in reduced turnover, increased recruitment, and increased productivity. *Id.*

Another substantial benefit of the Federal Contractor Rule, as explained by DOL, is the corresponding reduction in poverty for workers, especially those in historically underpaid or otherwise disadvantaged groups. *Id.* at 67,214-15. A recent study indicates that increasing the minimum wage provides net benefits to workers living in poverty, even when accounting for potential negative effects of a minimum wage increase on employment opportunities, such as reduced hours or fewer available positions.[8] It further determined that these improvements are meaningful; in fact, the authors suggest that increasing the minimum wage during the Great Recession would have "blunt[ed] the worst of the income losses."[9]

Increased wages are particularly important for groups that face disproportionate income inequality, such as women, people of color, younger workers, and less educated workers. 86 Fed. Reg. at 67,214-15 (collecting studies). For example, according to a 2019 study assessing the role that gender plays in wages, "less-educated, less-experienced, and female workers are more directly affected by a rise in the minimum wage than more-educated, more-experienced, and male workers."[10] A case study of firms covered by Boston's living wage law likewise concluded that the "living wage beneficiaries are . . . primarily women and people of color."[11]

---

[8] Kevin Rinz & John Voorheis, *The Distributional Effects of Minimum Wages: Evidence from Linked Survey and Administrative Data*, at 20 (2018),
https://www.census.gov/content/dam/Census/library/working-papers/2018/adrm/carra-wp-2018-02.pdf.

[9] *Id.* at 21.

[10] Tatsushi Oka & Ken Yamada, *Heterogeneous Impact of the Minimum Wage*, Journal of Human Resources at 18 (July 2019),
https://web.archive.org/web/20220301005426id_/http://jhr.uwpress.org/content/early/2021/08/17/jhr.58.3.0719-10339R1.full.pdf.

[11] Mark D. Brenner & Stephanie Luce, *Living Wage Laws in Practice: The Boston, New Haven and Hartford Experiences*, Political Economy Research Institute, at 45 (2005),
http://peri.umass.edu/fileadmin/ pdf/research_brief/RR8.pdf.

As DOL explained, increasing the wage of federal contractors would directly benefit these groups, since "many of the contracts that would be covered by this rule can be found in industries characterized by low pay and workforces largely comprised of" people of color, women, and LGBTQ+ workers. 86 Fed. Reg. at 67,215 (internal quotations omitted).

These justifications are amply supported not only by the case studies and other literature discussed by DOL, *id.* at 67,212-15, but also by the State and local experience of implementing similar policies for their contractors, which are often described as "living wage laws."[12] Indeed, the States and localities that have raised minimum wages for their own contractors have found that such policies "create better quality jobs for communities" and "improve the contracting process both by reducing the hidden public costs of the procurement system, and by shifting purchasing towards more reliable, high road contractors."[13] As one example, "[r]esearch by independent, academic economists indicates that New York's prevailing wage law is a uniquely valuable component of state policy that simultaneously uplifts residents and communities while imposing minimal, if any, cost on taxpayers."[14] The research also found that high-wage contractors attract more skilled and productive workers and use the industry's most advanced technology, allowing them to place competitive bids on contracts.[15] In a similar vein, a study of the "Los Angeles living wage law found that staff turnover rates at firms affected by the law

---

[12] Sonn, *supra* note 3, at 13 (describing state and local "living wage laws").

[13] *Id.*

[14] Russell Ormiston, *et al.*, *New York's Prevailing Wage Law*, Economic Policy Institute (Nov. 1, 2017), https://www.epi.org/publication/new-yorks-prevailing-wage-law-a-cost-benefit-analysis/.

[15] *Id.*

13

averaged 17 percent lower than those at firms that were not, and that the decrease in turnover offset 16 percent of the cost of the higher wages."[16]

### B. The benefits of the minimum wage increase outweigh any minimal costs to employers.

Additionally, there is substantial evidence that any additional costs to employers are outweighed by the benefits associated with the wage increase. Indeed, DOL reviewed literature examining the impact of minimum wage increases on prices to the public and concluded that while the "size of the price increases will vary based on the company and industry," the extent of the price increases at issue here have been "overstated" by commentators opposed to the Rule. 86 Fed. Reg. at 67,206-07. In reaching that conclusion, DOL also took into account the "various benefits [employers] will observe, such as increased productivity and reduced turnover," which could, in turn, improve the quality of services and "attract more customers and result in increased sales." *Id.* at 67,207. DOL also noted that contractors would likely be able to renegotiate their contracts with the federal government to account for any increased costs associated with the minimum wage increase. *Id.*

Additionally, DOL's conclusion that any costs associated with an increase in the minimum wage would be minimal is borne out by local experience. Indeed, a "review of the effects of living wages in a dozen local jurisdictions found that contract costs increased by less than 1.0 percent of each jurisdiction's total budget."[17] A Johns Hopkins University study likewise found that contract costs increased by only 1.2% in Baltimore, the first locality to

---

[16] Sonn, supra note 3, at 14 (citing David Fairris et al., Examining the Evidence: The Impact of the Los Angeles Living Wage Ordinance on Workers and Businesses, Los Angeles Alliance for a New Economy).

[17] *Impact of the Maryland Living Wage*, Maryland Dep't of Legislative Services, at 5 (2008), https://msa.maryland.gov/megafile/msa/speccol/sc5300/sc5339/000113/011000/011487/unrestricted/20090376e.pdf.

14

implement a living wage requirement for city contractors, upon review of 26 contracts "compared before and after the living wage law was implemented."[18]

## CONCLUSION

For these reasons, and those given by defendants, the Court should grant defendants' motion to dismiss.

---

[18] *Id.*

Dated: May 4, 2022

Respectfully submitted,

KWAME RAOUL
Attorney General of Illinois

By: /s/ Darren Kinkead
Darren Kinkead (Illinois Bar No. 6304847)
Office of the Illinois Attorney General
100 W. Randolph St.
Chicago, IL 60601
(773) 590-6967
Darren.Kinkead@ilag.gov
Attorneys for Amici States

Rob Bonta
*Attorney General of California*

Kathleen Jennings
*Attorney General of Delaware*

Aaron M. Frey
*Attorney General of Maine*

Maura Healey
*Attorney General of Massachusetts*

Keith Ellison
*Attorney General of Minnesota*

Matthew J. Platkin
*Acting Attorney General
of New Jersey*

Letitia James
*Attorney General of New York*

Josh Shapiro
*Attorney General of Pennsylvania*

Thomas J. Donovan, Jr.
*Attorney General of Vermont*

William Tong
*Attorney General of Connecticut*

Karl A. Racine
*Attorney General of the
District of Columbia*

Brian E. Frosh
*Attorney General of Maryland*

Dana Nessel
*Attorney General of Michigan*

Aaron D. Ford
*Attorney General of Nevada*

Hector Balderas
*Attorney General of New Mexico*

Ellen F. Rosenblum
*Attorney General of Oregon*

Peter F. Neronha
*Attorney General of Rhode Island*

Robert W. Ferguson
*Attorney General of Washington*

## CERTIFICATE OF COMPLIANCE

I certify that the total number of words in this motion, exclusive of the matters designated for omission, is 4,121, as counted by Microsoft Word.

_____

## CERTIFICATE OF SERVICE

I certify that a true and accurate copy of the foregoing document was served on May 4, 2022, via U.S. mail and email, on counsel of record using the details set forth below:

Christopher D. Hilton (christopher.hilton@oag.texas.gov)
Amy Snow Hilton (amy.hilton@oag.texas.gov)
Courtney Brooke Corbello (courtney.corbello@oag.texas.gov)
Halie Elizabeth Daniels (halie.daniels@oag.texas.gov)
Office of the Attorney General of Texas
General Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548

John V. Coghlan (john.coghlan@ago.ms.gov)
State of Mississippi
Office of the Attorney General
550 High Street
Jackson, MS 39201

Elisabeth Daigle
Elizabeth Baker Murrill (murrille@ag.louisiana.gov)
Joseph Scott St. John (stjohnj@ag.louisiana.gov)
Louisiana Department of Justice
1885 N. Third St.
Baton Rouge, LA 70804

Justin Sandberg (justin.sandberg@usdoj.gov)
Taisa M. Goodnature (taisa.m.goodnature@usdoj.gov)
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L St. NW
Washington, DC 20530

_____