# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### VICTORIA DIVISION

| | |
|---|---|
| STATE OF TEXAS *et al.*,<br><br>       *Plaintiffs*,<br><br>  v.<br><br>JOSEPH R. BIDEN *et al.*,<br><br>       *Defendants.* | Civil Case No. 6:22-CV-00004 |

## PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION TO DISMISS/MOTION FOR SUMMARY JUDGMENT AND PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

I.   FACTUAL BACKGROUND ........................................................................ 7

II.  STANDARD OF REVIEW ....................................................................... 10

III. SUMMARY OF THE ARGUMENT .......................................................... 11

IV.  ARGUMENTS & AUTHORITIES ............................................................ 11

    A.    Plaintiffs have standing.............................................................. 11

    B.    The President acted *ultra vires* because the Procurement Act does not authorize the President to issue minimum wage regulations.............................................. 13

        1.    The Wage Mandate lacks a sufficient nexus to the Procurement Act. ................... 15

        2.    Congress's actions demonstrate it never delegated this authority to the President. 21

        3.    The President acted *ultra vires* because he cannot require the FAR Council to amend the FAR.............................................................................. 22

    C.    The President's sweeping view of his authority under the Procurement Act violates the Separation of Powers under either the Major Questions Doctrine or the Nondelegation Doctrine............................................................ 24

        1.    The vast economic and political significance of this issue and the breadth of authority claimed by the President demand application of the Major Questions Doctrine. ... 25

        2.    There is no precedent for limiting the Major Questions Doctrine to administrative agencies rather than the Executive Branch *in toto*, including the President........... 28

            a.    The Court should decline to extend the "proprietary action" vs. regulation distinction from the NLRA preemption context to this case. ............................ 29

            b.    The Wage Mandate is not merely "proprietary action" because it applies to the non-government contracts of those who do business with the Government....... 30

    D.    The President's coercive use of the Procurement Act to regulate the wage practices of federal contractors implicates the central concerns of Spending Clause jurisprudence. 31

        1.    Coercive use of the federal spending power to vicariously accomplish constitutionally impermissible ends is the central concern of Spending Clause jurisprudence............................................................ 31

        2.    The President seeks to use federal spending to coerce private entities and State instrumentalities to impose policy preferences the President and Congress failed to implement through bicameralism and presentment. ............................... 33

        3.    There is no precedential or logical basis for limiting Spending Clause jurisprudence to "grants" as opposed to "contracts." ................................................. 33

    E.    Defendants' rulemaking violated the Administrative Procedure Act. ....................... 34

1. Defendants' rulemaking pursuant to the Executive Order is subject to judicial review under the APA............................................................................. 34

2. Defendants exceeded their statutory authority. ................................................. 39

3. The Final Rule is arbitrary and capricious. ...................................................... 39

V.  PRAYER ............................................................................................................ 43

CERTIFICATE OF SERVICE ................................................................................... 46

# TABLE OF AUTHORITIES

## Cases

*Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592 (1982) ............................ 12

*Am. Fed'n of Lab. & Cong. of Indus. Organizations v. Kahn*, 618 F.2d 784 (D.C. Cir. 1979) .. passim

*Ancient Coin Collectors Guild v. U.S. Customs & Brder Prot., Dept' of Homeland Sec.*, 801 F. Supp. 2d 383 (D. Md. 2011) ........................................................... 38

*Ashcroft v. Iqbal*, 556 U.S. 663 (2009) ......................................................... 10

*Bldg. & Const. Trades Council v. Associated Builders & Contractors*, 507 U.S. 218 (1993) ............ 29

*Bond v. United States*, 564 U.S. 211 (2011) ..................................................... 31

*Boudreaux v. Swift Transp. Co.*, 402 F.3d 536 (5th Cir. 2005) ..................................... 11

*Building & Constr. Trades Dep't v. Allbaugh*, 295 F.3d 28 (D.C. Cir. 2002) ................................ 29

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ................................................... 11

*Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1994) .......... 26

*City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225 (9th Cir. 2018) ................................ 31, 40

*Contractors Ass'n of E. Pa. v. Sec'y of Labor*, 442 F.2d 159 (3d Cir. 1971) .................................... 16

*Dalton v. Specter*, 511 U.S. 462 (1994) ......................................................... 34, 35, 36

*Dep't of Com. v. New York*, 139 S. Ct. 2551 (2019) ................................................ 7

*Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891 (2020) .................... 37

*Detroit International Bridge Company v. Government of Canada* 185 F. Supp. 3d 85 (D.D.C 2016) .................................................................. 33

*DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891 (2020) ....................................... 37

*Diebold v. U.S.*, 947 F.2d 787 (1991) ........................................................... 36

*Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 136 S. Ct. 2117 (2016) ............................ 36, 37

*FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000) .................................. 18

*Feds for Medical Freedom v. Biden* No. 3:21-CV-356, 2022 WL 188329 (S.D. Tex. Jan. 21, 2022) ..................................................................... 22, 25

*Franklin v. Massachusetts*, 505 U.S. 788 (1992) ................................................. 30, 31, 32

*Free Enter. Fund v. Public Co. Accounting Oversight Bd.*, 561 U.S. 477 (2010) ............................ 24

*Georgia v. Biden*, -- F. Supp. 3d --, 2021 WL 5779939 (S.D. Ga. Dec. 7, 2021) ........................... 15

*Hawaii v. Trump*, 859 F.3d 741 (9th Cir. 2017) ................................................... 6

*Kentucky v. Biden*, 23 F.4th 585 (6th Cir. 2022) ................................................. passim

*Liberty Mut. Ins. Co.*, 639 F.2d 164 (4th Cir. 1981) ............................................. 13, 16

*Response to Defendants' Motion for Summary Judgment & Cross-Motion for Summary Judgment*     iv

*Massachusetts v. EPA*, 549 U.S. 497 (2007) ................................................................7

*Michigan v. EPA*, 576 U.S. 743 (2015) ....................................................................37

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) ...  39, 40, 41

*Myers v. United States*, 272 U.S. 52 (1926) ...............................................................25

*Nat'l Fed'n of Indep. Bus. v. Occupational Safety & Health Admin.*, 142 S. Ct. 661 (2022) ...........24

*New Mexico v. Dep't of Interior*, 854 F.3d 1207 (10th Cir. 2017)...........................................22

*NFIB v. Sebelius*, 567 U.S. 519 (2012) ........................................................ 28, 31, 32, 33

*Pennhurst State School and Hospital v. Halderman*, 451 U.S. 1 (1981)....................................27, 29

*Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004) .............................................................23

*Sprint v. APCC Servs., Inc.*, 554 U.S. 269 (2008) ..........................................................13

*State v. Biden*, 10 F.4th 538 (5th Cir. 2021) ...............................................................13

*Steward Machine Co. v. Davis*, 301 U.S. 548 (1937)...........................................................32

*Sturgeon v. Frost*, 139 S. Ct. 1066 (2019) ..................................................................8

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007).........................................4

*Texas v. United States*, -- F.4th--, No. 22-40367, 2022 WL 2466786 (5th Cir. July 6, 2022) .........7

*True v. Robles*, 571 F.3d 412 (5th Cir. 2009).................................................................4

*United Techs. Corp. v. U.S. Dep't of Def.*, 601 F.3d 557 (D.C. Cir. 2010) ..................................36

*Van v. LLR, Inc.*, 962 F.3d 1160 (9th Cir. 2020) ............................................................7

*Washington v. Trump*, 847 F.3d 1151 (9th Cir. 2017) ......................................................12

*West Virginia v. EPA*, 597 U.S. ___ (2022) (slip op., at 17) ...................................passim

**Statutes**

19 U.S.C. § 2602(a)(1) .......................................................................................34

29 C.F.R. § 10.5(a) ...........................................................................................2

29 C.F.R. § 10.24(a) ..........................................................................................2

33 U.S.C. § 535(b) ...........................................................................................33

40 U.S.C. § 101................................................................................................8, 16

40 U.S.C. § 121(a) ................................................................................ 13, 21, 23, 28

40 U.S.C. § 3142................................................................................................17

41 U.S.C. § 1121(d) ..........................................................................................19

41 U.S.C. § 1303(a)(1) .......................................................................................19

41 U.S.C. § 1303(a)(2) ...................................................................................... 19

41 U.S.C. § 6502(1) .......................................................................................... 17

41 U.S.C. § 6702(a) .......................................................................................... 17

5 U.S.C § 701 *et seq* ........................................................................................ 30

54 U.S.C. § 320301 ........................................................................................... 33

**The Constitution**

U.S. CONST. art. I, § 7 ...................................................................................... 21

U.S. CONST. art. I, § 8 ...................................................................................... 27

U.S. CONST. art. I, § 9 ...................................................................................... 27

**Rules**

Fed. R. Civ. P. 12(b)(6) ..................................................................................... 4

Fed. R. Civ. P. 56(a) .......................................................................................... 5

Fed. R. Evid. 1006 ............................................................................................. 6

Fed. R. Evid. 201 ............................................................................................... 6

Fed. R. Evid. 803(6) .......................................................................................... 6

**Regulations**

86 Fed. Reg. 22,836 .......................................................................................... 4

43 Fed. Reg. 51375 (1978) ............................................................................... 11

86 Fed. Reg. 67,126–67,236 (November 23, 2021) ................................. passim

**Other Authorities**

1 JAMES KENT, COMMENTARIES ON AMERICAN LAW 433 (1826) ............................ 17

ANTONIN SCALIA & BRYAN GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 252 (2012) ....................................................................................................... 17, 18

H.R. REP. NO. 81-670, at 1498 ....................................................................... 1, 3

*History of Executive Order* 11246, https://perma.cc/6ZXJ-WGR8 ................................. 4

Henry Ford once quipped that a Model T customer could "have a car painted any color that he wants, so long as it is black."[1] Similarly, here, the President instructed Defendants to set the contractor minimum wage to whatever they deemed rational, so long as it was $15 per hour. In so doing, the President exceeded his authority under the Procurement Act and deprived the Department of Labor of its ability to comply with the APA. As the Department concedes, the outcome of its administrative factfinding was preordained. *See* Dkt. #27 at 27 ("DOL could not say to the President, '$15 per hour, that's a good suggestion, but we'll decide if it makes sense to us.'"). And, as such, the Department cannot demonstrate the rational connection between its *post-hoc* "factfinding" and its inescapable "choice." Defendants' Motion to Dismiss, or in the Alternative, Motion for Summary Judgment should be denied, and the Wage Mandate should be set aside and permanently enjoined.

## I.   FACTUAL BACKGROUND

President Biden campaigned on raising the minimum wage to $15/hour[2] and prioritized doing so from the beginning of his presidency.[3] The New York Times described it as "a crucial plank of Mr. Biden's plan,"[4] and the Fight for $15 labor activists celebrated the President's

---

[1] Henry Ford, *My Life and Work*, 72 (Garden City, N.Y., Doubleday 1922), publicly available at shorturl.at/bcjtv.

[2] *Statement by President Joe Biden on $15 Minimum Wage for Federal Workers and Contractors Going into Effect*, The White House, https://www.whitehouse.gov/briefing-room/statements-releases/2022/01/28/statement-by-president-joe-biden-on-15-minimum-wage-for-federal-workers-and-contractors-going-into-effect/ (last visited July 8, 2022) (Appx.1).

[3] Oscar Gonzalez, *$15 federal minimum wage amendment fails in Senate*, CNET (March 5, 2021), https://www.cnet.com/personal-finance/15-federal-minimum-wage-amendment-fails-in-senate-heres-what-you-should-know/ (last visited July 8, 2022) (Appx. 2–6).

[4] *Id.*

support for their cause.[5] It quickly became clear, however, that the President lacked Congressional support for his efforts. In February 2021, Congress failed to pass legislation that would increase the minimum wage to $15/hour.[6] Congress also voted down[7] the Raise the Wage Act of 2021 which would also have raised the federal minimum wage to $15/hour.[8] Although the Congressional Budget Office forecasted that increasing the minimum wage would result in higher prices for goods and services and increases in federal spending,[9] the President voiced his displeasure with Congress's vote.[10] Undeterred by the lack of Congressional support, on April 27, 2021, President Biden issued Executive Order 14026, *Increasing the Minimum Wage for Federal Contractors*, raising the previous wage floor for federal contractors first set forth by President Obama in Executive Order 13658 and later through rulemaking by the Department of Labor at 29 C.F.R. §§ 10.5(a), 10.24(a).

---

[5] *Fight for $15 minimum wage heats up after Biden's endorsement*, CNN, https://www.cnn.com/2021/05/08/business/minimum-wage-biden-waDlmart/index.html (last visited July 8, 2022) (Appx.8).

[6] Emily Cochrane, *Top Senate Official Disqualifies Minimum Wage from Stimulus Plan* (Feb. 25, 2021), THE NEW YORK TIMES, https://www.nytimes.com/2021/02/25/us/politics/federal-minimum-wage.html (last visited July 8, 2022) (Appx.8).

[7] Emily Cochrane, *Minimum wage increase fails as 7 Democrats vote against the measure*, The New York Times, https://www.nytimes.com/2021/03/05/us/minimum-wage-senate.html (last visited July 4, 2022) (Appx.13).

[8] *The Budgetary Effects of the Raise the Wage Act of 2021*, Congressional Budget Office (Feb. 8, 2021), https://www.cbo.gov/publication/56975 (last visited July 8, 2022) (Appx.17).

[9] *Id.*

[10] Jacob Pramuk, *$15 minimum wage not allowed in Biden's Covid relief bill, Senate official says*, CNBC (Feb. 25, 2021), https://www.cnbc.com/2021/02/25/15-minimum-wage-decision-biden-covid-relief-bill.html (last visited July 8, 2022) (Appx.36).

Executive Order 14026 increased the wage floor from $10.10/hour to $15/hour. 86 Fed. Reg. 67,126 (November 23, 2021).[11] The Executive Order delegates to the Secretary of Labor the authority to issue regulations to implement the order. 86 Fed. Reg. 2,836; 86 Fed. Reg. 67,195. The Final Rule implements the minimum wage requirements set out in the Executive Order and requires federal contractors (as defined broadly by the Final Rule) to pay employees a minimum wage of $15 per hour and overtime wages if employees work more than 40 hours per week. 86 Fed. Reg. 67,227. The minimum wage is subject to yearly increase as determined by the Department of Labor. *Id.* The Executive Order also requires the Federal Acquisition Regulatory Council to amend the Federal Acquisition Regulation (FAR) within 60 days of the Secretary's promulgation of regulations. 86 Fed. Reg. 22,836.

The authority for the Wage Mandate[12] rests solely on the President's authority under the Federal Property and Administrative Services Act (the "Procurement Act"). *See* 86 Fed. Reg. at 67,129. The legislative history of this Act shows Congress was focused on getting the best price in government contracting. *See* H.R. REP. NO. 81-670, at 1498 (1949). The law was intended to "centralize" and introduce flexibility into government contracting to remedy duplicative contracts and inefficiencies after World War II. *See Am. Fed'n of Lab. & Cong. of Indus. Organizations v. Kahn*, 618 F.2d 784, 787–88 (D.C. Cir. 1979); *Kentucky v. Biden*, 23 F.4th 585, 606 (6th Cir. 2022).

---

[11] When the Department of Labor promulgated the Final Rule, the minimum wage was $10.95 per hour, in accordance with inflation adjustments. 86 Fed. Reg. 67,126.

[12] The "Wage Mandate" refers to both Executive Order 14026 and the Final Rule.

Approximately one out of every ten dollars of Federal government spending goes to Federal contractors.[13] Indeed, according to the Department of Labor, one-fifth of the entire United States labor force is employed by federal contractors. *Kentucky*, 23 F.4th at 591 (citing Dep't of Labor, *History of Executive Order* 11246, https://perma.cc/6ZXJ-WGR8). It is, therefore, "imperative that contract actions result in the best value for the taxpayer."[14]

## II.   STANDARD OF REVIEW

When considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court must accept "all well-pleaded facts as true" and view "those facts in the light most favorable to the plaintiff." *See True v. Robles*, 571 F.3d 412, 417 (5th Cir. 2009). It is well established that "[c]ourts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss[.]" *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). To survive a 12(b)(6) motion, a complaint need only "contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 663, 678(2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 at 570). This standard is met where "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the Defendant is liable for the misconduct alleged." *Id.* at 678 (citing *Twombly*, 550 U.S. at 556).

A court "shall grant summary judgment if . . . there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex*

---

[13] *The Office of Federal Procurement Policy*, OFFICE OF MANAGEMENT & BUDGET, https://www.whitehouse.gov/omb/management/office-federal-procurement-policy/ (last visited July 8, 2022) (Appx.41).

[14] *Id.*

*Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The movant "must demonstrate the absence of a genuine issue of material fact," but does not have "to negate the elements of the nonmovant's case." *Id.*; *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005).

### III.   SUMMARY OF THE ARGUMENT

Defendants lack authority to issue the Wage Mandate. The Procurement Act does not authorize the President to promulgate the requirements of the Executive Order, and Defendants violated the Administrative Procedure Act when they promulgated the Final Rule implementing the Executive Order's mandate. Defendants' contention that they are insulated from judicial review falls flat. Defendants acknowledged the applicability of the APA by engaging in notice and comment rulemaking and expressly noted that nothing in the rule precluded judicial review under the APA. Moreover, Defendants offer no limiting principle to the President's authority, and Defendants' actions implicate significant constitutional concerns. Chief among these are the major-questions doctrine and the limits on coercive use of the federal spending power. The defendants' distinctions are poorly supported in the case law and fundamentally at odds with the principles informing these constitutional doctrines.

### IV.   ARGUMENTS & AUTHORITIES

#### A.   Plaintiffs have standing.

In one sentence in a footnote, Defendants assert that Plaintiffs lack standing to challenge the Wage Mandate's application to subcontractors. Dkt. #27 at 23 n.8. On the contrary. The Final Rule relies on data from USASpending.gov. *See, e.g.*, 86 Fed. Reg. 67,195–96; 67,198. That database lists numerous contracts for which Texas, Mississippi, and Louisiana agencies are

subcontractors.[15] For the same reasons Plaintiff States have standing to contest the Wage Mandate as it applies to contractors, they also have standing to contest it with respect to subcontractors. *See also Hawaii v. Trump*, 859 F.3d 741, 765 (9th Cir. 2017), *vacated and remanded on other grounds*, 138 S. Ct. 377 (2017) (state has standing to challenge federal policies that affect public universities because it has "proprietary interests as an operator of [a] University"); *Washington v. Trump*, 847 F.3d 1151, 1150 (9th Cir. 2017) (injuries to States' universities also "give the States standing to assert the rights of the 10 [university] students, scholars, and faculty affected").

Further, the States have a "quasi-sovereign interest in the health and well-being—both physical and economic—of [their] residents in general." *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 607 (1982). Plaintiff States will suffer financial harms due to Defendants' unlawful Wage Mandate. While the precise cost is unknowable, Defendants do not— and cannot— dispute that the Plaintiff States will spend *some* amount of money in public assistance for those who are laid off as a result of Defendants' Wage Mandate. This is a "predictable effect of Government action on the decisions" made by Defendants. *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2566 (2019). Indeed, Defendants relied on a Congressional Budget Office report issued in February 2021 that indicated that "[s]pending for unemployment compensation would increase . . . because more workers would be unemployed."[16] Increased costs to the States is sufficient to

---

[15] *See* Appx.115–197. This website is "[a]n official website of the U.S. government" and is subject to stringent and detailed reporting and accuracy requirements. *See* "About," USA Spending, https://www.usaspending.gov/about (last visited July 8, 2022). Accordingly, this data falls within the business- and public-records hearsay exceptions, *see* Fed. R. Evid. 803(6), (8), and the Court can and should take judicial notice of its content, *see* Fed. R. Evid. 201. Moreover, the exhibits attached to this motion reflecting the contents of this database are admissible to permit and aid in convenient examination by the Court. *See* Fed. R. Evid. 1006.

[16] Dkt. #28-1 at 10 (Congressional Budget Office, *The Budgetary Effects of the Raise the Wage Act of 2021* (February 2021), https://www.cbo.gov/publication/56975 (Appx.17–33)).

establish standing. *Texas v. United States*, -- F.4th--, No. 22-40367, 2022 WL 2466786, at *3 (5th Cir. July 6, 2022). "The causal chain is easy to see, and the Government does not meaningfully contest this point." *State v. Biden*, 10 F.4th 538, 548 (5th Cir. 2021). Nor would it matter if the amount of the gross loss were small; "[f]or standing purposes, a loss of even a small amount of money is ordinarily an 'injury.'" *Van v. LLR, Inc.*, 962 F.3d 1160, 1162 (9th Cir. 2020). Even "a dollar or two" of injury suffices. *Sprint v. APCC Servs., Inc.*, 554 U.S. 269, 289 (2008). Accordingly, the States have standing to seek redress of this inevitable harm.[17]

Moreover, it is of "considerable relevance that the party seeking review here is a sovereign State," because States are not "normal litigants for the purposes of invoking federal jurisdiction." *Massachusetts v. EPA*, 549 U.S. 497, 518, 526 (2007). States should be given "special solicitude" in the standing analysis where, as here, the States seek to obtain judicial recourse for illegal agency action under the APA and where the States' sovereign interests are at stake. *Id.* at 520.

**B.    The President acted *ultra vires* because the Procurement Act does not authorize the President to issue minimum wage regulations.**

The President acted *ultra vires* and exceeded his statutory authority when he promulgated the Executive Order. *See* Dkt. #1 at 21–24. The Procurement Act permits the President to "prescribe policies and directives that the President considers necessary to carry out this subtitle." 40 U.S.C. § 121(a). By its plain terms, the Procurement Act does not authorize the President to issue wage regulations. Defendants do not—and cannot—dispute this. *See* Dkt. #27. Instead, Defendants read the President's grant of authority with the subtitle's statement of purpose:

> The purpose of this subtitle is to provide the Federal Government with an economical and efficient system for the following activities:

---

[17] Moreover, it is sufficient if only one State has standing *See Texas v. United States*, 2022 WL 2466786, at *3.

(1) Procuring and supplying property and nonpersonal services, and performing related functions including contracting, inspection, storage, issue, setting specifications, identification and classification, transportation and traffic management, establishment of pools or systems for transportation of Government personnel and property by motor vehicle within specific areas, management of public utility services, repairing and converting, establishment of inventory levels, establishment of forms and procedures, and representation before federal and state regulatory bodies.

(2) Using available property.

(3) Disposing of surplus property.

(4) Records management.

40 U.S.C. § 101.

Statements of purpose, however, are not grants of authority. *Kentucky*, 23 F.4th at 604 (citing *Sturgeon v. Frost*, 139 S. Ct. 1066, 1086 (2019)). Accordingly, Defendants must link this statement of purpose with some enumerated power that would allow the President to mandate a minimum wage. *Id.* They do not. While the President's authority under the Procurement Act to prescribe "policies and directives" may have allowed him to instruct the Department of Labor that his administration's policy is to pay contractors a living wage, he is not authorized to mandate a specific number to the Department of Labor. As described in § B(3) *infra*, the President's authority to prescribe "policies and directives" is distinct from an authority to prescribe rules or regulations.

The cases Defendants rely on to overcome this lack of a grant fare no better. *See* Dkt. #27 at 19. Their primary support, *Farkas v. Texas Instruments*, does not, contra Defendants, say that the Procurement Act is so broad that it allows the President to mandate an increase in the minimum wage. 375 F.2d 629 (5th Cir. 1967). First, the scope of the President's authority under the Procurement Act was not at issue there. *Id.* at 632 n.1. Second, the anti-discrimination provision

in *Farkas* is different from the wage mandate here. In addition to its moral repugnance, invidious discrimination is patently inefficient. Making decisions on the basis of race, creed, color, or natural origin rather than merit necessarily results in less efficient contracting. *Id.* at 631.

    1.  <u>The Wage Mandate lacks a sufficient nexus to the Procurement Act.</u>

The Wage Mandate lacks a sufficiently close nexus to the purposes of the Procurement Act to survive judicial scrutiny. *AFL-CIO v. Kahn*, upon which Defendants rely, is not to the contrary. 618 F.2d 784 (D.C. Cir. 1979) The *Kahn* court considered whether President Carter exceeded his Procurement Act authority when he issued an executive order limiting wage and price increases for federal contractors. *Id.* at 785–86 (citing 43 Fed. Reg. 51375 (1978)). At issue was whether the President could limit those increases to ensure the government got "the greatest advantage" in terms of a lower ultimate cost. *Id.* at 793; *see also id.* at 793 n.48 (congressional policy behind the Procurement Act was to "encourage procurement officers to consider 'need, quality of product, or lower ultimate cost' as well as price").

Unlike the order at issue here, the D.C. Circuit determined that the *Kahn* executive order had a "sufficiently close nexus" to the purposes of the Procurement Act—namely, economy and efficiency in government contracting. 618 F.2d at 792. That executive order satisfied the nexus test because "if the voluntary restraint program is effective in slowing inflation in the economy as a whole, the Government will face lower costs in the future than it would have otherwise." *Id.* at 793.

The Executive Order at issue here does no such thing—in fact, it does the opposite. Defendants do not—cannot—describe how the wage and price *ceilings* at issue in *Kahn* support the President's mandate increasing the wage *floor*. This distinction matters because "it is in the

interest of the United States in all procurement to see that its suppliers are not over the long run increasing its costs." *Id.* at 792 (citing *Contractors Ass'n of E. Pa. v. Sec'y of Labor*, 442 F.2d 159, 170 (3d Cir. 1971)). A procurement policy that prohibits contractors from increasing wages has an obvious nexus to economical and efficient government: it holds down contractors' wage costs and thus the government's acquisition costs.

Holding down the government's acquisition costs is in line with the Procurement Act's conferral of authority for "supervising the Government's *management functions.*" *Kahn*, 618 F.2d at 788 (emphasis added). The Procurement Act was to bring the private sector's "efficient, business-like system of property management" to the government, *id.* at 787 n.16, including a concern for ultimate cost and price. *Id.* at 789, 789 n.23. The *Kahn* court therefore emphasized the importance of "the nexus between wage and price standards and likely savings to the Government." *Id.* at 793. It strains credulity to extrapolate from this managerial authority to help the government save money to a power to set a wage floor for one-fifth of the economy.

Of course, "[e]conomy and efficiency are not narrow terms," but the *Kahn* court took pains to note that its opinion did "not write a blank check for the President to fill in at his will." *Id.* at 793. Indeed, Judge Tamm concurred specifically to highlight that "the opinion we issue today is a narrow one. It does not allow the President to exercise powers that reach beyond the Act's *express* provision." *Id.* at 797 (Tamm, J., concurring) (emphasis added).

Similarly, Defendants' reliance on *UAW v. Chao* is inapposite. *UAW-Labor Empmt. & Training Corp. v. Chao*, 325 F.3d 360 (D.C. Cir. 2003). That case considered nothing so portentous as unilaterally mandating a minimum wage for millions of employers. Rather, it concerned whether the President could require contractors to post notices informing employees of their rights to not

be forced to join a union. 325 F.3d at 362. As the *Chao* court noted, expanding the available workforce is economical—or, at the very least, would not increase contracting costs. *Id.* at 367. Not so with the Wage Mandate, the very goal of which is to increase contracting costs.

Earlier this year, the Sixth Circuit emphasized that *Kahn* "stresses the narrowness" of the President's authority. *Kentucky*, 23 F.4th at 608. It noted that the Procurement Act's purpose is to economize and streamline the federal government's processes for contracting for procurement of goods and services—*not* to make contractor employees more economical or efficient. *Id.* at 605–06. It does not, that is, authorize the President to impose mandates that he "thinks . . . would enhance [contractors'] personal productivity." *Id.* at 605. The President's assertion that "[r]aising the minimum wage enhances worker productivity and generates higher-quality work by boosting workers' health, morale, and effort," Executive Order 14026, is wholly unrelated to the Procurement Act's purposes.

Similarly, the Fourth Circuit in *Liberty Mutual v. Friedman* held that an affirmative-action employment program for federal contractors was not "reasonably within the contemplation of" the Procurement Act. *Liberty Mut. Ins. Co. v. Friedman*, 639 F.2d 164, 172 (4th Cir. 1981). It noted that "the [*Kahn*] court took great pains to emphasize that [its] holding was rested *narrowly* upon the manifestly close nexus between the Procurement Act's criteria of efficiency and economy and the Executive Order's predominant objective of containing procurement costs." *Id.* at 170 (citing *Kahn*, 618 F.2d 793) (emphasis added).

Defendants' assertion that the Executive Order furthers "efficiency and economy" in federal contracting is belied by their own pleadings and the Final Rule itself. There is no reason to believe that an enormous increase in the contractor minimum wage will have the "direct and

immediate effect of *holding down* the Government's procurement costs." *Kahn*, 618 F.2d at 792 (emphasis added). Higher labor costs for contractors will of course lead to *higher* government expenditures. Defendants admit as much: "contractors [could] pass along part or all of the increased cost to the government in the form of higher contract prices"—in other words, *increasing* government expenditures. 86 Fed. Reg. 67,206. Defendants' own estimates anticipate at least $1.7 billion in annual costs to contractors along with millions of dollars in annualized compliance costs. *Id.* at 67,206–09.

Defendants' only nod to possible cost savings is to suggest that some "contractors *may* have the ability to negotiate a lower percentage sales paid as rent or royalty to the Federal Government . . . that *could* help to offset any costs that may be incurred as a result of the order." 86 Fed. Reg. 67,150 (emphasis added). In other words, the Government would spend more and receive less. This is entirely contrary to the purposes for the Procurement Act. While the 1949 House Report on the Procurement Act does not mention wages, it *does* say that the Government's "negotiated price [on bids] must be the lowest negotiated price offered by any responsible supplier." H.R. Rep. No. 81-670, at 1498. Whether the Procurement Act contemplates regulation of wages or not, it certainly does *not* contemplate *increased* costs to the Government.

Defendants further admit that the "Department did not quantify benefits of this rulemaking due to uncertainty and data limitations." *Id.* at 67,212. And the studies on which Defendants base their assertions of potential benefits "do[] not directly consider a change in the minimum wage equivalent to this final rulemaking (*e.g.*, for non-tipped workers from $10.60 to $15). Additionally, much of the literature is based on voluntary changes made by firms." *Id.* Indeed, while Defendants contend the Wage Mandate will "improve[] government services,

increase[] morale and productivity, reduce[] turnover, reduce[] absenteeism, increase[] equity and reduce[] poverty and income inequality," they fail to explain why private firms have failed to take up these benefits themselves. *See* 86 Fed. Reg. 67,195. If increasing wages would lead to higher efficiency and greater profits, surely firms would implement this measure themselves.

Moreover, even if these unsupported benefits exist, they are too attenuated and speculative to support a finding that they share a close nexus with the purposes of the Procurement Act. *Kahn*, 618 F.2d at 792–93. The very same arguments Defendants advance in support of this mandate would also support employer drug testing, mandatory vaccinations, health screenings, or anything else the President could argue would increase the efficiency of businesses that contract with the government. The President's authority is not so unbounded. *See Kentucky*, 23 F.4th at 608 (concluding that the goal of "reducing absenteeism" could not justify vaccine mandate under the Procurement Act"); *see also Georgia v. Biden*, -- F. Supp. 3d --, 2021 WL 5779939 (S.D. Ga. Dec. 7, 2021) (holding that President Biden was unlikely to succeed in establishing that the COVID-19 vaccine mandate for federal contractors had a close nexus to the purposes of the Procurement Act even though the President believed it would create a "more efficient workforce" or "reduce absenteeism").

Defendants' interpretation of the Procurement Act offers no limiting principle. Defendants' interpretation begs the question asked by the Sixth Circuit: "[W]hy, if the government's interpretation is correct, does the Property Act not confer a *de facto* police power upon the President to dictate the terms and conditions of one-fifth of our workforce's lives?" *Kentucky*, 23 F.4th at 608. If Defendants are correct "—that the President can do essentially whatever he wants so long as he determines it necessary to make federal contractors more

'economical and efficient'—then that *certainly* would present non-delegation concerns." *Id.* at 607 n.14.

The case for "efficiency and economy" in federal contracting is further undermined by the evidence cited by Defendants of the *negative* consequences of increasing the minimum wage. The studies cited by Defendants demonstrate that increasing the minimum wage results in increased costs to consumers *and* to the government. For example, Defendants cite findings from the Maryland General Assembly's Office of Policy Analysis assessing the impact of an increase in the wages for State contractors to $11.30/hour.[18] In its analysis, Maryland determined that "[o]nly one vendor said he had taken steps to absorb some of the increased costs prompted by the increase in wages. He said he had cut working hours by about 10 percent across the board. . . . Otherwise, all vendors indicated that they were passing the full cost of increased wages on to the State."[19] In the Final Rule, Defendants assert that the effects of disemployment as a result of increasing the minimum wage are "likely to be much smaller" than what the Congressional Budget Office predicts, "[b]ecause many federal contractors can pass most of the cost increase on to the Federal Government." 86 Fed. Reg. 67,212.

Finally, the Executive Order is on even shakier ground in its extension to subcontractors, as subcontractors have "no direct connection to federal procurement." *Liberty Mut. Ins. Co.*, 639 F.2d 164, 171 (4th Cir. 1981). As such, Defendants must demonstrate both that the requirements of the Executive Order on subcontractors bear a reasonably close nexus to the purposes of the Procurement Act *and* that the statutory grant of authority to the President reasonably contemplates

---

[18] Appx.77 (Admin. Record Vol 5 at PDF page 137).

[19] *Id.*

*Response to Defendants' Motion for Summary Judgment & Cross-Motion for Summary Judgment*     20

the President's authority to impose those requirements on subcontractors. *Id.* at 168, 170. Defendants make no effort to do so in their Motion to Dismiss/Motion for Summary Judgment. *See generally* Dkt. #27. This may well be explained by the fact that subcontractors are not even mentioned in the statutory text on which Defendants rely. *See* 40 U.S.C. § 101, 121(a).

The absence of any reference to subcontractors reflects the limitations on the President's Procurement Act authority, as demonstrated by the history and purpose of the Act. As described above, the Procurement Act was intended to "centralize" and introduce flexibility into government contracting to remedy duplicative contracts and inefficiencies after World War II— not to provide the President with a limitless grant of authority to reshape one-fifth of the national economy however he deemed fit. *See Kahn*, 619 F.2d at 787–88; *Kentucky*, 23 F.4th at 606; *id.* at 606, n.13 ("We include our brief discussion of the Senate Report in a way that Justice Scalia once advocated—to show that not only does the text preclude the government's fanciful construction but that, indeed, the text's progenitors likewise did not understand themselves to be encoding within it such a novel and sweeping power.") (discussing *Green v. Bock Laundry Machine Co.*, 490 U.S. 504, 527 (Scalia, J., concurring in the judgment)

2.  <u>Congress's actions demonstrate it never delegated this authority to the President.</u>

That Congress has legislated—in multiple statutes—how much federal contractors should be paid demonstrates that Congress never delegated authority to the President to determine wages for federal contractors. Federal contractors are subject to specific and complex statutory wage schemes set forth in the Davis Bacon Act (DBA), the Walsh-Healey Public Contracts Act (PCA), and the Service Contract Act (SCA). 40 U.S.C. § 3142; 41 U.S.C. §§ 6502(1); 6702(a). These statutes specifically concern the subject of minimum wages for federal contractors. These statutes

evidence that Congress intended to reserve for itself authority to set minimum wage policies, particularly in the federal contracting sphere. *See e.g.*, ANTONIN SCALIA & BRYAN GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 252 (2012) ("Several acts *in pari materia*, and relating to the same subject, are to be taken together, and compared in the construction of them, because they are considered as having one object in view, and as acting upon one system.") (citing 1 JAMES KENT, COMMENTARIES ON AMERICAN LAW 433 (1826); *see also id.* at 111 ("[T]he negative-implication canon is so intuitive that courts often apply it correctly without calling it by name.").

It strains credulity to believe that Congress understood at the time it passed either the Procurement Act, DBA, PCA, or SCA that Defendants could simply fix a minimum wage nationwide for these contractors by executive fiat. *See New Mexico v. Dep't of Interior*, 854 F.3d 1207, 1226 (10th Cir. 2017) (holding that it was "implausible" to believe that the Department of the Interior had implicit power to "create an alternative to the explicit and detailed remedial scheme" provided by statute). Congress passed the SCA 16 years after it passed the Procurement Act, thereby indicating that Congress did not believe that the President had the authority to promulgate minimum wage provisions by executive fiat. *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 143 (2000) ("[T]he implications of a statute may be altered by the implications of a later statute. This is particularly so where the scope of the earlier statute is broad but the subsequent statutes more specifically address the topic at hand.") (citation omitted).

3. The President acted *ultra vires* because he cannot require the FAR Council to amend the FAR.

Assuming *arguendo* that the President has authority to promulgate a minimum wage mandate pursuant to the Procurement Act, he still acted *ultra vires* because the Procurement Act

does not authorize him to require the FAR Council to amend the FAR. The Procurement Act permits the President to prescribe certain "policies and directives" within the scope of the Act. 40 U.S.C. § 121(a). This grant of authority to the President is distinct from that of the GSA Administrator: while the President is authorized to prescribe "policies and directives," the Administrator "may prescribe *regulations.*" 40 U.S.C. § 121(a), (c) (emphasis added); *see also Sosa v. Alvarez-Machain*, 542 U.S. 692, 711 n.9 (2004) ("[W]hen the legislature uses certain language in one part of the statute and different language in another, the court assumes different meanings were intended."); *see also* SCALIA & GARNER at 170 ("[W]here the document has used one term in one place, and a materially different term in another, the presumption is that the different term denotes a different idea.")

Under the Procurement Policy Act (and subject to only limited exceptions), the FAR Council has the exclusive authority to issue "a single [g]overnment-wide procurement regulation." 41 U.S.C. § 1303(a)(1).[20] The Procurement Act does not authorize the President to issue government-wide procurement regulations with the force and effect of law. But that is exactly what the President does in his Executive Order. The President's Executive Order demands the FAR Council "amend the Federal Acquisition Regulation to provide for inclusion in Federal procurement solicitations, contracts, and contract-like instruments" to include 'as a condition of payment, the minimum wage to be paid to workers employed in the performance" of those covered contracts at least "$15.00 per hour, beginning January 30, 2022." Executive Order 14026.

---

[20] The Procurement Policy Act allows the OFPP Administrator to issue government-wide regulations if the Department of Defense, NASA, and GSA are unable to agree on or fail to issue to regulations. 41 U.S.C. § 1121(d). The OFPP Administrator may also remove a regulation if it is inconsistent with the FAR. *Id.* § 1303(a)(5).

Defendants' contention that "[t]he statute does not purport to grant such authority *exclusively*" is disingenuous. Dkt. #27 at 29 (emphasis added). While 41 U.S.C. § 1303(a)(2) indicates that regulations relating to procurement may be issued by "an executive agency," those regulations are *limited to* "regulations essential to implement Government-wide policies and procedure *within the agency*" and "additional policies and procedures required to satisfy the specific and unique needs *of the agency*." In other words, while executive agencies may promulgate their own policies within their own agencies, only the FAR Council has authority to issue Government-wide regulations.

## C.   The President's sweeping view of his authority under the Procurement Act violates the Separation of Powers under either the Major Questions Doctrine or the Nondelegation Doctrine.

Defendants seek to evade meaningful judicial review of the President's mandates under the Executive Order by describing his authority under the Procurement Act as "capacious." Dkt. #27 at 1. For the reasons detailed above, Plaintiffs disagree with that description of his authority. But nevertheless, while the President is correct that the Supreme Court has not invalidated a statute on nondelegation grounds in "over 85 years," this Court still has "good reason" to find that this act of Executive Branch lawmaking violates the separation-of-powers principles that inform both the major-questions and nondelegation doctrines. Dkt. #27 at 3. In order to decide this case, the Court need not exhume the nondelegation doctrine from the jurisprudential tomb where President Roosevelt's threats and the concomitant "switch in time to save the nine" have consigned it. Quite simply, "the breadth of authority" the President has asserted under this purportedly capacious grant and the "economic and political significance" of this assertion require a *clear* congressional authorization before concluding that Congress meant to confer such authority. *West Virginia v.*

*EPA*, 597 U.S. ___ (2022) (slip op., at 17) (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159-160).

1.  The vast economic and political significance of this issue and the breadth of authority claimed by the President demand application of the Major Questions Doctrine.

The Supreme Court's recent guidance in *West Virginia v. EPA*, should form the lodestar of this Court's analysis. 597 U.S. ___ (2022). In that case, the Court considered whether an EPA regulation that required shifting electricity generation from coal-fired plants to natural gas and renewables was "within the power granted to it by the Clean Air Act." *Id.* (slip op., at 2, 7-8). While noting that "generation shifting" (i.e., moving electricity production from coal to less-carbon-intensive sources) could be described as a "system"[21] as a matter of "definitional possibilities," the Court emphasized that "almost anything" could be a "system" under the Government's expansive interpretation and that "shorn of all context, the word is an empty vessel." *Id.* (slip op., at 28) (internal citation omitted). Thus, the Court held that "[s]uch a vague statutory grant is not close to the sort of clear authorization required by our precedents." *Ibid*. The Court distinguished this from other uses of "system" in the Clean Air Act, because "[i]t is one thing for Congress to authorize regulated sources to use trading to comply with a preset cap. . . . It is quite another to simply authorize EPA *to set the cap itself wherever the Agency sees fit*." *Id.* (slip op., at 29-30) (emphasis added).

Much as it was impermissible for the EPA to set a cap on coal-fired carbon emissions "wherever the Agency [saw] fit" based on the vague and long-enacted statutory provision at issue,

---

[21] The key statutory phrase was "best system of emission reduction." *See generally id.*

it is likewise impermissible for the President to set the floor on federal contractors' employees' wages based on the vague and long-enacted statutory provision at issue here.

The President seeks to evade application of the major-questions doctrine by asserting that "Congressional inaction [cannot] shed[] light on the scope of the President's authority to issue the challenged EO." Dkt. #27 at 16. The President is correct that "Congressional inaction cannot amend a duly enacted statute." *Ibid.* (quoting *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 186 (1994). But this facile invocation of an uncontroverted proposition sidesteps the relevant issue.

The repeated failure to pass the $15 minimum-wage law in the traditional (and constitutionally mandated) fashion of bicameralism and presentment, *see* U.S. CONST. art. I, § 7, demonstrates that this is an issue of vast economic and political significance to which the major-questions doctrine applies.[22] As the *EPA* Court plainly stated, "we cannot ignore that the regulatory writ EPA newly uncovered conveniently enabled it to enact a program that . . . Congress considered and rejected multiple times." 597 U.S., at ___ (slip op., at 27) (internal quotation omitted). Thus, while post-enactment legislative inactivity certainly has not amended the Procurement Act's meaning, it is highly probative of the economic and political significance of the issue and, therefore, the application of the major-questions doctrine.

---

[22] The amici States appear to advocate for a rule that an issue can only be of vast economic and political significance if it affects a minimum number of Americans and expenditure of funds. Dkt. #35 at 5. Such is not the standard for this inquiry, as the more recent *EPA* case demonstrates. Moreover, even if these were relevant factors, the Wage Mandate affects 1/5th of the nation's workforce and will result in $17 billion in expenditures, which amici States do not dispute. *See id.* at 6.

Of course, the economic and political significance of the issue is only one of the two key factors to consider when assessing whether the major-questions doctrine properly applies to a case. The other key factor—the history and breadth of the authority asserted—also counsels strongly in favor of applying the major-questions doctrine. As Defendants recite, "[f]or nearly a decade, pursuant to executive orders…certain federal contractors and subcontractors have been [subjected to] a minimum wage requirement as a condition of their contracts." Dkt. #27 at 4. Yet one must note that this eight-year history since President Obama promulgated Executive Order 13,658 pales in comparison to the 65 years between the enactment of the statute in 1949 and the first minimum-wage contractor requirement in 2014. President Obama's discovery of an "unheralded power" in a "long-extant statute" counsels in favor of applying the major-questions doctrine even if—and especially if—"[t]he legality of that prior executive order was never challenged." *EPA*, 597 U.S. ___ (slip op., at 20); Dkt. #27 at 1.

The breadth of the authority asserted counsels even more strongly in favor of the application of the major-questions doctrine than its lack of historical pedigree. As Defendants note, again and again, the President implemented this Executive Order pursuant to his purported "broad authority." *See e.g.* Dkt. #27 at 1, 7, 10. This "capacious grant of authority," *id.* at 1, is reason enough "to hesitate before concluding that Congress meant to confer such authority." *EPA*, 597 U.S. ___ (slip op., at 17).

In sum, the vast economic and political significance of the authority asserted, the lack of historical pedigree for such assertion, and the breadth of the authority asserted all counsel strongly in favor of applying the major-questions doctrine.

2. <u>There is no precedent for limiting the Major Questions Doctrine to administrative agencies rather than the Executive Branch *in toto*, including the President.</u>

Defendants attempt to limit the major-questions doctrine's application to only delegations of lawmaking authority granted to administrative agencies, not delegations to the President himself. Dkt. #27 at 21. Defendants base this distinction solely on the facts that "courts have expressed the concern that agencies lack direct political accountability" (citing *Nat'l Fed'n of Indep. Bus. v. Occupational Safety & Health Admin.*, 142 S. Ct. 661, 669 (2022) (Gorsuch, J., concurring)) and that "the President is unquestionably 'accountable to the people.'" Dkt. #27 at 21 (citing *Free Enter. Fund v. Public Co. Accounting Oversight Bd.*, 561 U.S. 477, 513 (2010)).

However, the Court in *West Virginia v. EPA* did not speak of "political accountability" as a rationale for the major-questions doctrine or as an essential factor for considering the application of the major-questions doctrine.[23] The Court spoke of only "separation of power principles" and "a practical understanding of legislative intent" as informing the major-questions doctrine. *West Virginia v. EPA* 597 U.S. at ____, (slip op., at 19). And Defendants cite no authority for the proposition that delegations to the President are meaningfully different from delegations to an administrative agency with respect to either separation-of-powers principles or a practical understanding of legislative intent.

---

[23] The Court focuses more on political accountability in legislative-commandeering and Spending Clause cases. *See e.g. NFIB v. Sebelius*, 567 U.S. 519, 578 (2012) ("Permitting the Federal Government to force the States to implement a federal program would threaten the political accountability key to our federal system.")

*Response to Defendants' Motion for Summary Judgment & Cross-Motion for Summary Judgment*   28

a. *The Court should decline to extend the "proprietary action" vs. regulation distinction from the NLRA preemption context to this case.*

Defendants next seek to avoid the Major Questions Doctrine by claiming that "EO 14,026 and its implementing rule do not exercise regulatory authority at all, but rather the federal government's proprietary authority." Dkt. #27 at 21. Defendants buttress this proposition by touting the President's "inherent Article II power to exercise 'general administrative control . . . throughout the Executive Branch of government, of which he is the head.'" *Id.* at 22 (citing *Building & Constr. Trades Dep't v. Allbaugh*, 295 F.3d 28, 32 (D.C. Cir. 2002). Defendants' ellipsis omits a crucial portion of text from Chief Judge Ginsburg: "[T]he President's power necessarily encompasses 'general administrative control *of those executing the laws*.'" *Allbaugh* at 32 (citing *Myers v. United States*, 272 U.S. 52, 164 (1926)) (emphasis added).

Even more importantly, the President does not explain why this proprietary authority vs. regulatory authority distinction should be extended from the National Labor Relations Act (NLRA) preemption context to the major-questions doctrine. As the *Allbaugh* Court stated, "the principles of NLRA preemption come into play only when the Government is 'regulating within a protected zone,' and not when it is acting as a proprietor, 'interacting with private participants in the marketplace.'" 295 F.3d at 34 (citing *Bldg. & Const. Trades Council v. Associated Builders & Contractors*, 507 U.S. 218, 227 (1993) (*Boston Harbor*)). Defendants fail to demonstrate why the "principles of NLRA preemption" rather than the principles undergirding the major-questions doctrine should apply here.

     *b.   The Wage Mandate is not merely "proprietary action" because it applies to the non-government contracts of those who do business with the Government.*

Even assuming that there is a principled reason to extend the proprietary-regulatory distinction from the NLRA preemption context to the major-questions doctrine, the President's action in instituting this federal-contractor minimum wage is plainly regulatory. As the *Allbaugh* Court continues, "a 'blanket rule'—applicable to all government contracts, *but not to the non-government contracts of those who do business with the Government*—is [not] inconsistent with the action of a proprietor." *Id.* at 35 (emphasis added). Here, the Government's action, by requiring the blanket rule of a $15 minimum wage—applicable to the non-government (wage) contracts of those who do business with the Government *and their own employees*—is inconsistent with the action of a proprietor. The government's action is regulatory because "decisions governed by the executive order are [not merely] those that the federal government makes as [a] market participant." *Ibid.* (citing *Kahn*, 618 F.2d, at 789 (D.C. Cir. 1979) (*en banc*)). On the contrary, with this Executive Order, the President seeks to regulate the activity of federal contractors *with third parties*, i.e. their own employees. This is a "blanket rule…applicable to the non-government contracts of those who do business with the Government" and, therefore, plainly regulatory under *Allbaugh.*

For the aforementioned reasons, this case falls squarely under the major-questions doctrine, and all of the Defendants' arguments and inventive distinctions are unavailing. Plaintiffs respectfully urge this honorable Court to make plain that not even the President of the United States is above separation-of-power principles and "a practical understanding of legislative intent."

**D.**    **The President's coercive use of the Procurement Act to regulate the wage practices of federal contractors implicates the central concerns of Spending Clause jurisprudence.**

Defendants chide Plaintiffs for "ignor[ing] the differences between grants and contracts" in seeking to apply the Spending Clause to this novel factual circumstance. Dkt. #27 at 28. But, in fact, all of the concerns that have actuated Spending Clause jurisprudence are heightened in this case of Executive spending discretion with respect to federal contracts.

The central concerns of Spending Clause jurisprudence are federalism and individual liberty. *See e.g., NFIB v. Sebelius*, 567 U.S. 519, 577 (2012) ("Respecting this limitation is critical to ensuring that Spending Clause legislation does not undermine the status of the States as independent sovereigns in our federal system. That system 'rests on what might at first seem a counterintuitive insight, that freedom is enhanced by the creation of two governments, not one.'") (citing *Bond v. United States*, 564 U.S. 211, 220–21 (2011)). In this case, separation-of-powers concerns are multiplied atop these traditional federalism and individual-liberty concerns by the Executive's unilateral adoption of significant limitations on the recipients of federal funds because "[t]he United States Constitution exclusively grants the power of the purse to Congress, not the President." *City & Cnty. Of San Francisco v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018) (citing U.S. Const. art. I, § 9, cl. 7; U.S. Const. art. I, § 8, cl. 1).

1.    Coercive use of the federal spending power to vicariously accomplish constitutionally impermissible ends is the central concern of Spending Clause jurisprudence.

The legitimacy of an exercise of the federal spending power "rests on whether the State voluntarily and knowingly accepts the terms of the 'contract.'" *Sebelius*, 567 U.S. at 577 (citing *Pennhurst State School and Hospital v. Halderman*, 451 U.S. 1, 17 (1981)). This leads courts to "scrutinize Spending Clause legislation to ensure that Congress is not using financial inducements

to exert a 'power akin to undue influence.'" *Ibid.* (citing *Steward Machine Co. v. Davis*, 301 U.S. 548, 590 (1937)). The federal government "may use its spending power to create incentives for States [and individuals] to act in accordance with federal policies. But when pressure turns into compulsion, the legislation runs contrary to our system of federalism." *Id.* at 577-578 (internal quotation omitted).

In *Sebelius*, Congress threatened to withhold existing Medicaid funds from any states that did not participate in the Medicaid Expansion under the Affordable Care Act. 567 U.S. at 579–80. As this threatened the loss of over 10 percent of a typical State's overall budget, the Court held that this was coercive financial inducement: "economic dragooning that leaves the States with no real option but to acquiesce in the Medicaid expansion." *Id.* at 582.

The situation is likely far more coercive for the typical federal contractor here. Defendants blithely reassure us that "private parties always remain free to opt out of contracting with the federal government if they are unwilling to comply with these conditions." Dkt. #27 at 9–10, n.6. But federal government contracting totals more than $500 billion annually "and finances millions of jobs across our economy."[24] To contend that "private parties always remain free to opt out" demonstrates that Defendants have wholly ignored the deep reliance interests threatened by the Wage Mandate. *Cf. Kentucky*, 23 F.4th at 595 ("The federal government of course *knows* that these reliance interests exist, which is why it seeks to purchase states' submission by leveraging those interests to force their acquiescence to the contractor mandate.")

---

[24] Appx.91 (Admin. Record Vol. 5 at PDF page 164).

2. The President seeks to use federal spending to coerce private entities and State instrumentalities to impose policy preferences the President and Congress failed to implement through bicameralism and presentment.

While Article I, Sections 1, 8, and 9 define the *substantive* limits of the federal legislative power, Article I, Section 7 plays an equally important role with respect to the *procedural* limits of the federal legislative power. Thus, while the *Sebelius* Court correctly stated that the "danger is heightened when Congress acts under the Spending Clause, because Congress can use that power to implement federal policy it could not impose directly under its enumerated powers," the danger is by no means lessened here where the President seeks to implement federal policy that Congress could not impose directly under the constitutionally enumerated process. 567 U.S. at 578.

3. There is no precedential or logical basis for limiting Spending Clause jurisprudence to "grants" as opposed to "contracts."

While Defendants contend that they "are not aware of any authority standing for the proposition that the Spending Clause cases Plaintiffs rely on apply to contracts," Defendants fail to provide any authority indicating that they do *not* apply to contracts. In *Pennhurst State School & Hospital v. Halderman*, the Supreme Court analogized the conditions of grants to the terms of contracts. 451 U.S. 1, 17 (1981). When actual contracts are at issue, the same reasoning applies *a fortiori*. Indeed, it would be counterintuitive if the Supreme Court's contract-based analogy held only for grants and not actual contracts themselves. Plaintiffs urge this Court to recognize that the same principles actuating Spending Clause jurisprudence apply in this case at least as forcefully— if not more so—than in a typical Spending Clause case, and therefore the President's inventive distinction should gain no foothold in American jurisprudence.

**E.**   **Defendants' rulemaking violated the Administrative Procedure Act.**

1. Defendants' rulemaking pursuant to the Executive Order is subject to judicial review under the APA.

Defendants' actions are not shielded from judicial review merely because they were implementing the President's Executive Order. *See Reich*, 74 F.3d at 1328 ("That the 'executive's action here is essentially that of the President does not insulate the entire executive branch from judicial review. . . . [C]ourts have power to compel subordinate executive officials to disobey illegal Presidential commands." (internal quotation marks omitted)). Indeed, Defendants' contention that they are shielded from judicial review because they "stepp[ed] into the shoes of the President" and exercised no discretionary authority is belied by the Final Rule itself: "[N]either the Executive order nor the proposed rule would preclude judicial review of final decisions by the Secretary [of Labor] in accordance with the Administrative Procedure Act, 5 U.S.C. 701 *et seq.*" Dkt. #27 at 27; 86 Fed. Reg. 67,132.

The Final Rule stipulates that "Executive Order 14026 directs the Department to issue regulations to implement the order and also grants the Department exclusive enforcement authority over the order." 86 Fed. Reg. 67,196. The Final Rule goes on to state that the Executive Order's directive to the FAR Council to amend the FAR is "dependent on the *Department's* rule and the *Department's* regulations." *Id.* (emphasis added). That the Department must promulgate its rule and regulations before the FAR Council can initiate its steps under the Executive Order demonstrates that the agency had to take rulemaking action—more than simply following orders. Defendants rely on *Dalton v. Specter*, 511 U.S. 462 (1994) and *Franklin v. Massachusetts*, 505 U.S. 788 (1992) for the proposition that "to the extent [the] Final Rule adopts discretionary choices

made by the President in the exercise of authority delegated to him," Defendants' actions are not subject to judicial review under the APA. Dkt. #27 at 35. 511 US 462.

Neither *Dalton* nor *Franklin* support this proposition. In both *Dalton* and *Franklin*, there was no final agency action—the prerequisite to judicial review under the APA. *Dalton. Dalton*, 511 U.S. at 469; *Franklin*, 505 U.S. at 796. But here, it is uncontested that the Final Rule constitutes final *agency* action.

In *Franklin*, the Court considered whether a Secretary's report that only became legally binding after Presidential action was final agency action for purposes of the APA. 505 U.S. at 796. The Supreme Court's holding—that the Secretary's report to the President was not "agency action" and the President himself is not an "agency" under the APA— did not rely on reasoning that would suggest or require a blanket rule that executive orders are *never* reviewable under the APA. In fact, the Court does not mention executive orders at all in the opinion. The Court determined that the report to the President was not "agency action" because (1) it was not promulgated to the public in the Federal Register, (2) it did not generate any official administrative record, and (3) the effect of the report was actualized *only after* Presidential action. 505 U.S. at 796.

The *Franklin* Court focused on when the legal rights and duties attach to an action of the Executive Branch. In *Franklin*, the Secretary's report had no legal effect unless and until the President took subsequent action. *See id.* at 797. Here, the legal duty of federal agencies to include the $15 minimum wage clause in all of their contracts did not attach until Defendants promulgated the Final Rule implementing the Executive Order. In both *Dalton* and *Franklin*, the applicable Secretary's action occurred before decisive action by the political branches to give binding legal effect to the Secretary's recommendations. *Dalton* is particularly instructive here, as the

Secretary's recommendation on military-base closures could not take effect until (1) the presidentially appointed and Senate confirmed Defense Base Closure and Realignment Commission issued a report assessing the Secretary's recommendations and providing the Commission's own recommendations; (2) the President decided whether to approve or disapprove the Commission's recommendations; and (3) the 45-day period for Congress to enact a "joint resolution of disapproval" after presidential certification had elapsed. 511 U.S. at 465. Thus, the Court held that there was no "final agency action" because "[w]hat is crucial is the fact that 'the President, not the [Commission], takes the final action that affects' the military installations. *Id.* at 470 (citing *Franklin* 505 U.S. at 799). Moreover, in *Dalton*, the applicable statute gave the President discretion to approve or disapprove the list of bases to be closed to be closed, which implicated his Commander-in-Chief authority. *Dalton*, 511 U.S. at 464–466, 473.

The additional string cite of other cases Defendants offer in support of their position are readily distinguishable. *See* Dkt. #27 at 26. Unfortunately for Defendants, when the Court begins to pull at the string of Defendants' citations, their legal theory begins to unravel. These cases fall within exceptions to the APA, such as decisions committed to the President's sole discretion or the foreign affairs exception.

First, in *Feds for Medical Freedom v. Biden*, the Court considered whether the President had authority to issue the challenged executive order. No. 3:21-CV-356, 2022 WL 188329, at *6–7 (S.D. Tex. Jan. 21, 2022). The Court held that if the underlying statute gives the President the discretion to issue the order, then there can be no APA challenge to the rule that he, in his discretion, can lawfully order the agency to adopt. *Id.*

Similarly, in *Tulare County v. Bush*, the Court considered whether a "background document" memorandum reflecting "management changes" pursuant to a presidential proclamation was subject to the APA. While the Court noted that the agency was "carrying out the directives of the President," it is of significant import here that Court held that the management plan was not final agency action. *Bush*, 185 F. Supp. 2d at 29. Moreover, the Antiquities Act at issue in that case gave the President the specific power to designate national monuments in the President's discretion. *Id.* at 24; 54 U.S.C. § 320301 ("The President may, in the President's discretion, declare by public proclamation historic landmarks . . . to be national monuments.").

*Detroit International Bridge Company v. Government of Canada* is similarly inapposite. In that case, the Court considered whether judicial review was available under the APA when the President retains final decision-making authority. 189 F. Supp. 3d 85, 100 (D.D.C. 2016). Here, the authority that requires contractors to implement the mandate is Defendants' Final Rule, not the freestanding executive order or any other decision of the President. Accordingly, Defendants' actions are *not* shielded from judicial review. Moreover, in *Detroit Int'l Bridge*, the Court held the State Department's actions were "unreviewable presidential action" because the statute at issue—the International Bridge Act of 1972—"gave the President broad discretionary authority to approve the construction and maintenance of international bridges." *Id.* at 100. The International Bridge Act assigns to the President the power to approve (or not) applications to construct international bridges, which is also a power that implicates the President's governance of foreign affairs. 33 U.S.C. § 535(b). Congress had expressly "remove[d] itself from the approval of each bridge" in the statute. *Detroit Int'l Bridge*, 189 F. Supp. 3d at 100. Both facts are lacking

here. Congress has not provided the President with broad discretion under the Procurement Act, and Congress has not removed itself from the sphere of establishing minimum wages for federal contractors.

Finally, *Ancient Coin Collectors Guild* is also distinguishable. In that case, the Court held that the State Department and Assistant Secretary's actions were not reviewable under the APA because the President had delegated narrow, specific authority *and* those actions were taken in the realm of foreign affairs," an area over which Congress usually grants deference to the President. *Ancient Coin Collectors Guild v. U.S. Customs & Brder Prot., Dept' of Homeland Sec.*, 801 F. Supp. 2d 383, 402–03 (D. Md. 2011 The statute at issue (the Cultural Property Implementation Act) gave the President power to determine whether conditions of a treaty relating to objects of archaeological interest had been satisfied, and it gave the President discretion to enter into an agreement to repatriate materials that satisfy those conditions—powers that implicate the President's governance of foreign affairs. 19 U.S.C. § 2602(a)(1).

By contrast, here, 40 USC § 121(a) says the President "may prescribe policies and directives that the President considers necessary to carry out this subtitle," but "[t]he policies must be consistent with this subtitle." He has no authority to direct the adoption of a policy that contradicts the APA, and he has no authority to direct action that is inconsistent with the purpose of the subtitle. The directive at issue here fails on both counts.

The Procurement Act does not commit the decision to the President's sole discretion; it furnishes a standard against which his decision can be tested. None of these cases hold what the Defendants imply—that an agency can avoid its obligations under the APA by pointing to the President's arbitrariness and caprice. The APA forbids arbitrary and capricious agency action

whether it is ordered by the President or not. It may be true that "DOL could not say to the President, '$15 per hour, that's a good suggestion, but we'll decide if it makes sense to us.'" Dkt. #27 at 27. But violating the law is not excused simply because one has been ordered to do it rather than doing so of one's own volition. Were that the case, the APA would be a dead letter; agencies could simply ask the President to order them to promulgate their proposed rules rather than publish them for public comment.

2.   Defendants exceeded their statutory authority.

The Parties do not dispute that, other than the President, Defendants have no statutory authority under the Procurement Act. *See generally* Dkt. #27. Because the requirements of the Executive Order exceeds the President's authority under the Procurement Act for the reasons detailed *supra*, Defendants exceeded any delegated statutory authority they had from the President.

Moreover, even if the President did have authority under the Procurement Act to mandate wage requirements, Defendants exceeded their statutory authority because the Final Rule conflicts with the purposes of the Procurement Act by *increasing* labor costs and it constitutes arbitrary and capricious agency action for the reasons detailed below.

3.   The Final Rule is arbitrary and capricious.

Under the APA, a court must "hold unlawful and set aside agency action" that is "arbitrary and capricious." *See* 5 U.S.C. § 706(2)(A). An agency action is arbitrary or capricious if it fails to "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The Procurement Act's "policy directive to pursue economy and

efficiency implicates numbers, measurement, and accountability and supplies a meaningful standard against which to evaluate an agency's exercise of discretion." *Diebold v. U.S.*, 947 F.2d 787, 796 (1991). Mere executive fiat falls well short of the requirement of a "satisfactory explanation." *See State Farm*, 463 U.S. at 43.

Neither the Executive Order nor the Final Rule provide any reasoning or explanation for how $15 specifically promotes economy and efficiency in procurement such that a Court could find a "rational connection between the facts found and the choice made." *See State Farm*, 463 U.S. at 43. The Final Rule is replete with assertions that Defendants could not consider any alternative to $15 and could not consider imposing the $15 increase gradually. *See, e.g.*, 86 Fed. Reg. 67,132; 86 Fed. Reg. 67,139; *see also* 86 Fed. Reg. 67,129 (stating that "comments questioning the legal authority and rationale underlying the President's issuance of the Executive order are not within the scope of this rulemaking action"). Defendants confirm as much in their briefing. "DOL could not say to the President, '$15 per hour, that's a good suggestion, but we'll decide if it makes sense to us.'" Dkt. #27 at 27.

This alone renders the Final Rule arbitrary and capricious. Where, as here, "the agency has failed to provide even that minimal level of analysis, its action is arbitrary and capricious and so cannot carry the force of law." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 136 S. Ct. 2117, 2125 (2016). Courts "do not defer to the agency's conclusory or unsupported suppositions," *United Techs. Corp. v. U.S. Dep't of Def.*, 601 F.3d 557, 562 (D.C. Cir. 2010), nor are agency actions "involving an issue of deep economic and political significance" entitled to deference, *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1242 (9th Cir. 2018) (cleaned up). And this Court cannot "supply a reasoned basis for the agencies' actions that the agencies themselves have not given."

*Id.* (cleaned up). Nor can the agency's litigation counsel. *State Farm*, 463 U.S. at 50 ("courts may not accept appellate counsel's *post hoc* rationalizations for agency action").

Moreover, the Final Rule does not promote economy and efficiency, as discussed above. It is clear that Defendants ignored costs to the States, which is a "centrally relevant factor when deciding whether to regulate." *Michigan v. EPA*, 576 U.S. 743, 752–53 (2015). "Consideration of cost reflects the understanding that reasonable regulation ordinarily requires paying attention to the advantages *and* the disadvantages of agency decisions." *Id.* (emphasis in original).

The Final Rule does not account for the States' reliance interests on the previous policy. *See Navarro*, 136 S. Ct. at 2126–27; *DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1914–15 (2020). For years, the States have been operating their federal contracts, and complying with wage requirements, pursuant to the SCA and DBA. The Rule does not account for the States' reliance on and operation under these statutes and the impact that will occur where the Rule requires a new, higher minimum wage never utilized before. This was error. "When an agency changes course, as [Defendants] did here, it must 'be cognizant that longstanding policies may have 'engendered serious reliance interests that must be taken into account.' " *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1913 (2020) (quoting *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221–22 (2016)). To avoid a finding of arbitrary and capricious agency action, Defendants "w[ere] required to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *Id.* at 1914. The Rule is devoid of any acknowledgement of the States' reliance on the specific wage statutes as controlling law on the matter of federal contracts and wages, much less a determination of the significance of the countervailing policy concerns engendered by that reliance interest.

Finally, the purported purpose of the Wage Mandate is a pretense. The Rule's speculative assertion that the mandate may somehow advance economy and efficiency by "enhanc[ing] worker productivity and generat[ing] higher-quality work" is a pretext for fulfilling the President's campaign platforms. President Biden's public statements leave no doubt that the true purpose of the Wage Mandate is to fulfill a campaign promise. It strains credulity to suggest otherwise. And whatever reasons Defendants give for the Final Rule, they acknowledge them to be pretextual both in their briefing and in the Final Rule. *See, e.g.*, Dkt. #27 at 27. In response to a comment requesting that the Department decline to implement the order, modify the amount of the $15 mandate, change the effective date, or phase in the wage rate over time, the Department stated, "Executive Order 14026 clearly directs the Department to issue regulations implementing its requirements. . . . There is no indication in the Executive order that the Department has authority to modify the amount or timing of the minimum wage requirement." 86 Fed. Reg. 67,130.

Courts are "not required to exhibit a naivete from which ordinary citizens are free." *Dep't of Commerce*, 139 S. Ct. at 2575. "The reasoned explanation requirement of administrative law . . . is meant to ensure that agencies offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public. Accepting contrived reasons would defeat the purpose of the enterprise." *Id.* at 2575–76. And indeed, as the Fifth Circuit has held, "courts have an affirmative duty *not* to" "turn a blind eye to the statements" of those promulgating nationwide mandates. *BST Holdings*, 17 F. 4th at 615.

## V.    PRAYER

For all these reasons, Plaintiffs respectfully request the Court deny Defendants' Motion to Dismiss, or in the alternative, Motion for Summary Judgment, and grant Plaintiffs' Motion for Summary Judgment.

Respectfully submitted,

**KEN PAXTON**
Attorney General of Texas

**BRENT WEBSTER**
First Assistant Attorney General

**GRANT DORFMAN**
Deputy First Assistant Attorney General

**SHAWN E. COWLES**
Deputy Attorney General for Civil Litigation

**CHRISTOPHER D. HILTON**
Chief, General Litigation Division
*Attorney-in-Charge*
Southern District No. 3029796
Texas Bar No. 24087727

*/s/ Amy S. Hilton*
**AMY SNOW HILTON**
Southern District No. 3350717
Texas Bar No. 24097834
amy.hilton@oag.texas.gov

**COURTNEY B. CORBELLO**
Southern District No. 3089117
Texas Bar No. 24097533
courtney.corbello@oag.texas.gov

**PIERCE NICHOLAS VAIL SMITH***
Texas Bar No. 24122531
pierce.smith@oag.texas.gov
**pro hac vice* application forthcoming

Office of the Attorney General of Texas
General Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548

**COUNSEL FOR THE STATE OF TEXAS**

JEFF LANDRY
Louisiana Attorney General

ELIZABETH B. MURRILL
 Solicitor General

*/s/ Joseph S. St. John*
JOSEPH S. ST. JOHN
 Deputy Solicitor General

ELISABETH DAIGLE
 Assistant Attorney General

Louisiana Department of Justice
1885 N. Third Street
Baton Rouge, LA 70804
Tel: (225) 326-6766
murrille@ag.louisiana.gov
stjohnj@ag.louisiana.gov
daiglee@ag.louisiana.gov

**COUNSEL FOR THE STATE LOUISIANA**

LYNN FITCH
Attorney General of Mississippi

*/s/ John V. Coghlan*
JOHN V. COGHLAN
Deputy Solicitor General

State of Mississippi
Office of the Attorney General
550 High Street
Jackson, MS 39201
Tel: (601) 359-3680
John.Coghlan@ago.ms.gov

**COUNSEL FOR
THE STATE OF MISSISSIPPI**

## <u>CERTIFICATE OF COMPLIANCE</u>

I certify that the total number of words in this proposed motion less portions excluded under Court Procedure 16(c), is 10,852 as counted by Microsoft Word.

*/s/ Amy S. Hilton*
**AMY S. HILTON**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 8, 2022, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notice of such filing to all registered CM/ECF users.

*/s/ Amy S. Hilton*
**AMY S. HILTON**