United States District Court
Southern District of Texas
**ENTERED**
September 26, 2023
Nathan Ochsner, Clerk

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**VICTORIA DIVISION**

| | | |
|---|---|---|
| The STATE OF TEXAS, the STATE OF LOUISIANA, and the STATE OF MISSISSIPPI, | § § § § | |
| Plaintiffs, | § § | |
| v. | § § | Civil Action No. 6:22-CV-00004 |
| JOSEPH R. BIDEN, President of the United States, in his official capacity, UNITED STATES DEPARTMENT OF LABOR, MARTIN J. WALSH, Secretary of the United States Department of Labor, in his official capacity, and JESSICA LOOMAN, Acting Administrator of the United States Department of Labor, in her official capacity, | § § § § § § § § § § § | |
| Defendants. | § § | |

## MEMORANDUM OPINION AND ORDER

Our Constitution's Framers viewed the principle of separation of powers as not just a guarantee, but the central guarantee of our Government.[1] To separate our Government's powers, the Constitution expressly enumerates these powers into three

---

[1]   *Freytag v. Comm'r of Internal Revenue*, 501 U.S. 868, 870, 111 S.Ct. 2631, 2634, 115 L.Ed.2d 764 (1991) ("The leading Framers of our Constitution viewed the principle of separation of powers as the central guarantee of a just government."); *Morrison v. Olson*, 487 U.S. 654, 697, 108 S.Ct. 2597, 2622, 101 L.Ed.2d 569 (1988) (Scalia, J., dissenting) ("The Framers of the Federal Constitution similarly viewed the principle of separation of powers as the absolutely central guarantee of a just Government.").

distinct branches of Government, codified in Articles I, II, and III.[2]  While these branches are not "hermetically sealed" from each other, each serves its own unique role.[3]  Through the required processes of bicameralism and presentment, Congress makes law.  The President then enforces Congress's law.  And the Judiciary interprets Congress's law.

This case implicates our Government's separation-of-powers balance.  In 1949, Congress passed a relatively benign act—the Federal Property and Administrative Services Act, commonly known as the "Procurement Act."  In short, the Procurement Act centralizes the process by which various goods and services are purchased by agencies on behalf of our Government.

On April 27, 2021, President Joseph R. Biden issued Executive Order 14,026 ("EO 14,026") relying on the Procurement Act as the basis for his executive order.  EO 14,026 increased the hourly minimum wage paid by federal contractors and subcontractors to certain employees to $15 per hour beginning January 30, 2022, with annual increases thereafter.  After engaging in notice-and-comment rulemaking, the United States Department of Labor published a final rule on November 24, 2021, implementing EO 14,026 (the "Final Rule" and, together with EO 14,026, the "Wage Mandate").

Shortly thereafter, three states—Texas, Louisiana, and Mississippi—brought suit in this Court against President Biden, the United States Department of Labor, and certain

---

[2]     *Miller v. French*, 530 U.S. 327, 341, 120 S.Ct. 2246, 2255, 147 L.Ed.2d 326 (2000) ("The Constitution enumerates and separates the powers of the three branches of Government in Articles I, II, and III, and it is this 'very structure' of the Constitution that exemplifies the concept of separation of powers.") (quoting *I.N.S. v. Chadha*, 462 U.S. 919, 946, 103 S.Ct. 2764, 2781–82, 77 L.Ed.2d 317 (1983)).

[3]     *Id.* (quoting *Chadha*, 462 U.S. at 951, 103 S.Ct. at 2784) (internal quotation marks omitted).

executives of the United States Department of Labor (together, "Defendants"), challenging the validity of the Wage Mandate. Collectively, Plaintiffs argue that the Wage Mandate is unlawful under the Procurement Act and the Administrative Procedure Act ("APA"), and unconstitutional under the non-delegation doctrine and the Spending Clause of the United States Constitution. This case has proceeded to the motion-to-dismiss stage, but the Parties have asked for their Motions to Dismiss to be alternatively considered as Motions for Summary Judgment.

In considering Plaintiffs' challenges to the Wage Mandate, the Court will not be evaluating whether raising the minimum wage paid by federal contractors and subcontractors to certain employees to $15 an hour is good policy. Instead, the Court will be answering one question: Did the President violate the Procurement Act in unilaterally raising the minimum wage paid by federal contractors to their employees to $15 an hour? The Court finds that he did.

Pending before the Court is Defendants' Motion to Dismiss or, in the alternative, for Summary Judgment, (Dkt. No. 27), and Plaintiffs' Response to Defendants' Motion to Dismiss/Motion for Summary Judgment and Plaintiffs' Cross-Motion for Summary Judgment, (Dkt. No. 49). For the following reasons, the Court (1) **GRANTS IN PART** and **DENIES IN PART** Defendants' Motion, (Dkt. No. 27), and (2) **GRANTS IN PART** and **DENIES IN PART** Plaintiffs' Cross-Motion, (Dkt. No. 49). The Court finds that Plaintiffs have proven that they are entitled to judgment as a matter of law as to Count I of their Complaint in which they assert that the President acted *ultra vires* and exceeded

3

his authority.[4]  The Court finds that Defendants have shown that they are entitled to partial judgment as a matter of law as to Counts II and III of Plaintiffs' Complaint as it relates to the Executive Order.  The Court declines to reach Count III, as it relates to the Final Rule, and Counts IV and V of Plaintiffs' Complaint.  The Court **ENJOINS** Defendants from enforcing Executive Order 14,026 and the Final Rule against the States of Texas, Louisiana, and Mississippi, and their agencies.  The Court **DENIES** all other requested relief.

## I.    BACKGROUND

During his 2020 presidential campaign, President Biden called for an increase to the federal minimum wage.[5]  However, he was unable to convince Congress to go along.[6]  On April 27, 2021, President Biden issued Executive Order 14,026, which, in relevant part, increased the minimum wage paid by federal contractors and subcontractors to certain employees to $15 per hour, beginning January 30, 2022, with annual adjustments for inflation thereafter.[7]  Exec. Order No. 14,026, 86 Fed. Reg. 22,835 (Apr. 30, 2021).

---

[4]    In the context of this case, *ultra vires* describes when a governmental body acts beyond its legal power or authority.  *See generally Ancient Coin Collectors Guild v. U.S. Customs & Border Prot., Dep't of Homeland Sec.*, 801 F.Supp.2d 383 (D. Md. 2011), *aff'd*, 698 F.3d 171 (4th Cir. 2012).

[5]    *Statement by President Joe Biden on $15 Minimum Wage for Federal Workers and Contractors Going Into Effect*, The White House (Jan. 28, 2022), https://www.whitehouse.gov/briefing-room/statements-releases/2022/01/28/statement-by-president-joe-biden-on-15-minimum-wage-for-federal-workers-and-contractors-going-into-effect/.

[6]    Emily Cochrane, *Top Senate Official Disqualifies Minimum Wage From Stimulus Plan*, The New York Times (Feb. 25, 2021), https://www.nytimes.com/2021/02/25/us/politics/federal-minimum-wage.html.

[7]    The minimum wage has been raised to $16.20 for 2023.  *Minimum Wage for Federal Contracts Covered by Executive Order 14026, Notice of Rate Change in Effect as of January 1, 2023*, 87 Fed. Reg. 59,464 (Sept. 30, 2022).

President Biden cited the Procurement Act as the sole basis for his authority to issue the Executive Order. *Id.* Specifically, President Biden invoked his authority to "promote economy and efficiency in procurement by contracting with sources that adequately compensate their workers[.]" *See id.* at 22,835. After engaging in notice-and-comment rulemaking, the United States Department of Labor published a final rule on November 24, 2021, implementing the Executive Order. *Increasing the Minimum Wage for Federal Contractors*, 86 Fed. Reg. 67,126 (Nov. 24, 2021). The States of Texas, Louisiana, and Mississippi thereafter filed this lawsuit. (Dkt. No. 1).

## II.    STANDING

To bring suit, a plaintiff must have standing. *Fed. Election Comm'n v. Cruz*, 596 U.S. ____, ____, 142 S.Ct. 1638, 1646, 212 L.Ed.2d 654 (2022). Defendants briefly contest standing in a footnote where they argue that, because Plaintiffs are not subcontractors, they cannot be injured by the provisions of the Wage Mandate that apply to subcontractors. (Dkt. No. 27 at 23 n.8). Plaintiffs contend that they have standing because (1) each State will suffer financial injury, (2) the States have a quasi-sovereign interest in the health and well-being of their residents, (3) the subcontractor provisions of the Wage Mandate are applicable to States because there are numerous contracts to which Texas, Louisiana, and Mississippi agencies are subcontractors, and (4) States are entitled to "special solicitude in the standing analysis[.]" (Dkt. No. 49 at 11–13). Defendants reply that the States have not shown that any of the State subcontractors currently earn less than $15 an hour and that any financial injury related to paying public assistance to those laid-off is too speculative. (Dkt. No. 58 at 14).

To have standing, the States "must have suffered an injury in fact—a concrete and imminent harm to a legally protected interest, like property or money—that is fairly traceable to the challenged conduct and likely to be redressed by the lawsuit." *Biden v. Nebraska*, 600 U.S. ____, ____, 143 S.Ct. 2355, 2365 (2023). Texas, Louisiana, and Mississippi each maintain that they have standing, but only one State needs to show standing for the Court to proceed to the merits of the case. *Id*. ("If at least one plaintiff has standing, the suit may proceed."). The Court will consider whether Texas has established standing.[8]

### A.   INJURY IN FACT

Texas has sufficiently established that it will suffer injury as a result of the Wage Mandate. First, Texas has demonstrated that arms of the State routinely contract with the federal government, both directly and as subcontractors. (*See* Dkt. No. 49-1 at 117–99). As such, many state agencies, state-funded universities, and other arms of the State of Texas are subject to the Wage Mandate and will be impacted because a number of their employees are paid less than $15 an hour. (*See* Dkt. No. 1 at 9–10); *see also* 86 Fed. Reg. at 67,195 ("The direct transfer payments associated with this rule are transfers of income from employers to employees in the form of higher wage rates. Estimated average annualized transfer payments are $1.7 billion per year over 10 years.").

---

[8]    In addition to their monetary injuries, the States, in their briefing, also allege injury to their quasi-sovereign interests. (*See* Dkt. No. 49 at 12). However, in explaining what those quasi-sovereign interests are, the States refer again to their own financial harms. (*See id.* at 12–13). Accordingly, the Court will consider the States to have demonstrated injury-in-fact only through their own incurred costs.

Second, Texas contends that increasing the minimum wage will result in increased government spending, particularly with respect to its Children's Health Insurance Program, its State funded unemployment compensation, and public assistance generally. (*See* Dkt. No. 1 at 10–12); *see also* Congressional Budget Office (CBO), The Budgetary Effects of the Raise the Wage Act of 2021 (Feb. 10, 2021), https://www.cbo.gov/system/files/2021-02/56975-MinimumWage.pdf (stating that the CBO estimates that raising the minimum wage to $15 per hour would increase spending for some programs, such as unemployment compensation); *id.* at 3 ("Medicaid spending would increase because the effects of increases in the price of health care services and increases in enrollment by people who would be jobless as a result of the minimum-wage increase would outweigh the effects of decreases in enrollment by people with higher income."); *id.* ("The effects on spending for the Children's Health Insurance Program (CHIP) would similarly reflect higher prices for medical services[.]").

Third, Texas will incur costs to ensure compliance with the Wage Mandate, including record-keeping costs and costs incurred to implement inflation adjustments made each year.  (*See* Dkt. No. 1 at 12); *see also* 86 Fed. Reg. at 67,204 ("Average annualized regulatory familiarization costs over ten years, using a 7 percent discount rate, is $1.9 million.").

The evidence of Texas's injury is generally uncontroverted by Defendants and instead largely acknowledged as effects from the Wage Mandate in the implementing regulations.  *See* 86 Fed. Reg. at 67,204–12.  The Court finds that Texas has demonstrated a concrete and particularized, actual injury.  As the Supreme Court has indicated, for

standing purposes, even "a dollar or two" of injury suffices.  *See, e.g.*, *Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 289, 128 S.Ct. 2531, 2544, 171 L.Ed.2d 424 (2008).  And Texas has certainly met this threshold.

### B.   TRACEABILITY

This case does not present a traceability problem.  Texas is a federal contractor and subcontractor that has employees who were paid below $15 an hour prior to the Wage Mandate.  At the very least, having to now pay employees additional wages is enough to show that Texas's injury results from the Wage Mandate.  Additionally, EO 14,026's implementing regulations acknowledge the various effects the increased minimum wage will have on the economy, particularly those effects of which Texas complains.  86 Fed. Reg. at 67,204–12.  Those include regulatory familiarization costs, implementation costs, and transfer payments to workers in the form of higher wages.  *Id.*  Defendants do not respond to this.  (*See* Dkt. No. 27 at 23 n.8); (*See* Dkt. No. 58 at 13–14).  Here, the Court finds that Texas has sufficiently demonstrated that its injuries are a result of the Wage Mandate.

### C.   REDRESSABILITY

"When establishing redressability, a plaintiff need only show that a favorable ruling could potentially lessen its injury; it need not definitively demonstrate that a victory would completely remedy the harm."  *Sanchez v. R.G.L.*, 761 F.3d 495, 506 (5th Cir. 2014) (cleaned up).  Again, Defendants do not contest the redressability element of Texas's standing.  (*See* Dkt. No. 27 at 23 n.8); (*See* Dkt. No. 58 at 13–14).  Here, a ruling by the Court invalidating the Wage Mandate would remedy the injury complained of by

Texas, because Texas would no longer be required to pay its employees additional wages. As such, the Court finds that redressability has been satisfied.[9]

The Court holds that the States have standing.[10]

## III.   LEGAL STANDARD[11]

Summary judgment is appropriate when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A material fact is one that might affect the outcome of the suit under governing law," and "a fact issue is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  *Renwick v. PNK Lake Charles, L.L.C.*, 901 F.3d 605, 611 (5th Cir. 2018) (internal quotation marks omitted).  The moving party "always bears the initial responsibility of informing the district court of the basis for its motion," and identifying the record evidence "which it believes demonstrate[s] the absence of a

---

[9]    The Court recognizes that Texas believes it is entitled to special solicitude in the standing analysis.  (Dkt. No. 49 at 11–13).  Generally, a party entitled to special solicitude can satisfy standing "without meeting all the normal standards for redressability and immediacy[.]" *Massachusetts v. E.P.A.*, 549 U.S. 497, 517–18, 127 S.Ct. 1438, 1453, 167 L.Ed.2d 248 (2007) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 572 n.7, 112 S.Ct. 2130, 2142 n.7, 119 L.Ed.2d 351 (1992)).  The Court finds that whether special solicitude is implicated or not in this case is of little moment, because even without special solicitude Texas has sufficiently shown that the requirements for Article III standing are satisfied.

[10]    The Court notes that a district court in Arizona reviewed a similar challenge to EO 14,026 brought by the State of Arizona.  Albeit for slightly different reasons, the district court held that Arizona had Article III standing.  *See Arizona v. Walsh*, No. 3:22-CV-00213, 2023 WL 120966, at *3–4 (D. Ariz. Jan. 6, 2023).

[11]    "If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56."  Fed. R. Civ. P. 12(d); *see also Burns v. Harris Cnty. Bail Bond Bd.*, 139 F.3d 513, 517 (5th Cir. 1998).  Here, the Parties have submitted an administrative record, (Dkt. No. 28), and neither party is opposed to treating this motion as one for summary judgment, so the Court will construe Defendants' Motion to Dismiss as a Motion for Summary Judgment.

genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2253, 91 L.Ed.2d 265 (1986). "If the moving party fails to meet [its] initial burden, the motion [for summary judgment] must be denied, regardless of the nonmovant's response." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam).

If the movant meets this burden, the nonmovant must come forward with specific facts showing there is a genuine issue for trial. Fed. R. Civ. P. 56(c); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). The nonmovant must "go beyond the pleadings and by [the nonmovant's] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Nola Spice Designs, LLC v. Haydel Enters., Inc.*, 783 F.3d 527, 536 (5th Cir. 2015). "If the evidence is merely colorable, or is not significantly probative," summary judgment is appropriate. *Parrish v. Premier Directional Drilling, L.P.*, 917 F.3d 369, 378 (5th Cir. 2019). The nonmovant's burden "will not be satisfied by 'some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence.'" *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005) (quoting *Little*, 37 F.3d at 1075).

## IV.    DISCUSSION

Plaintiffs bring five counts in their Complaint. (Dkt. No. 1 at 21–29). In Count I, Plaintiffs claim that by issuing EO 14,026, President Biden acted *ultra vires* and exceeded his authority under the Procurement Act. (*Id.* at 21–24). In Count II, Plaintiffs claim that the Wage Mandate is unlawful under the APA. (*Id.* at 24). In Count III, Plaintiffs claim

that in implementing the Final Rule, the Department of Labor's actions were arbitrary and capricious, and thus should be set aside as unlawful.  (*Id.* at 25–26).  In Count IV, Plaintiffs claim that if the Wage Mandate is found lawful under the Procurement Act, then the non-delegation doctrine bars Congress from transferring its legislative power to another branch of government.  (*Id.* at 26–28).  And in Count V, Plaintiffs claim that if the Wage Mandate is found lawful under the Procurement Act, then it violates the Constitution's Spending Clause.  (*Id.* at 28–29).

The Court classifies Plaintiffs' claims into four broad categories: (1) the President's authority under the Procurement Act, (2) Plaintiffs' claims under the APA, (3) Plaintiffs' claim under the non-delegation doctrine, and (4) Plaintiffs' claim under the Spending Clause.  The Court will address each category in turn.

### A.  COUNT I: THE PRESIDENT'S AUTHORITY UNDER THE PROCUREMENT ACT

The Parties dispute the scope of the President's authority under the Procurement Act.  *Compare* (Dkt. No. 49 at 13–30) *with* (Dkt. No. 27 at 17–33).  In assessing the scope of Presidential power in this context, courts of appeals have used different analytical frameworks.  *See Am. Fed'n of Lab. & Cong. of Indus. Organizations v. Kahn*, 618 F.2d 784, 792–93 (D.C. Cir. 1979) (applying the "close nexus" test in resolving a Procurement Act case); *Kentucky v. Biden*, 23 F.4th 585, 603–10 (6th Cir. 2022) (undertaking a statutory analysis); *Georgia v. President of the United States*, 46 F.4th 1283, 1292–97 (11th Cir. 2022) (applying a statutory analysis while relying in part on the major questions doctrine);

*Louisiana v. Biden*, 55 F.4th 1017, 1028–31 (5th Cir. 2022) (applying the major questions doctrine within the statutory analysis in resolving a Procurement Act case).[12]

The Fifth Circuit has recently suggested that a textual analysis of the statute remains the primary method for district courts.  *See Louisiana,* 55 F.4th at 1032 (holding that the Procurement Act is subject to "our legal principles of statutory interpretation"); *see also Kentucky*, 23 F.4th at 604 (looking to the statute's "plain text"); *Georgia*, 46 F.4th at 1298 (same).[13]  Therefore, the Court will begin with a statutory analysis, and then consider the applicability of the major questions doctrine to this case.  While Defendants request the Court to employ the close-nexus test, the Fifth Circuit recently called this framework into question,[14] and as such, the Court declines to do so.[15]

### 1.   <u>Statutory Analysis</u>

The Parties dispute whether the Procurement Act's plain meaning authorizes EO 14,026.  (Dkt. No. 27 at 17–33); (Dkt. No. 49 at 13–30).  Defendants do not specifically

---

[12]   Recently, the Fifth Circuit detailed the history of Procurement Act cases, from its inception to modern-day practice.  *See Louisiana v. Biden*, 55 F.4th 1017, 1023–30 (5th Cir. 2022).

[13]   Albeit under a different statute, the Supreme Court recently undertook a textual analysis in considering the bounds of executive authority under the HEROES Act.  *See Nebraska*, 600 U.S. at ____, 143 S.Ct. at 2368–71.

[14]   In the Fifth Circuit's words: "[T]his Court does not today determine whether or not the 'close nexus' test is the proper test for evaluating the lawfulness of executive orders under the Procurement Act.  The Eleventh Circuit has made a compelling case that the text and structure of the Procurement Act are inconsistent with this test.  In any case, such a determination is not necessary for resolution of the case before us."  *Louisiana*, 55 F.4th at 1026 n.25 (citation omitted).

[15]   The Court is aware of two district court cases out of Colorado and Arizona that consider EO 14,026 under the Procurement Act.  Both of these cases use the close-nexus test as the exclusive analytical framework for Procurement Act cases.  *See Bradford v. U.S. Dep't of Lab.*, 582 F.Supp.3d 819, 833–41 (D. Colo. 2022); *Arizona v. Walsh*, No. 3:22-CV-00213, 2023 WL 120966, at *5–9 (D. Ariz. Jan. 6, 2023).  The Fifth Circuit, however, has all but discarded the route taken by these two cases.  *See Louisiana*, 55 F.4th at 1026 n. 25.

address whether, under traditional principles of statutory interpretation, the Procurement Act grants authority to the President to raise the minimum wage of the employees of federal contractors and subcontractors to $15 dollars an hour. (*See generally* Dkt. No. 27). Instead, Defendants generally argue that two of the Procurement Act's provisions, read together, provide the President a broad grant of authority to unilaterally implement policies "that the President considers necessary to foster an economical and efficient system for procuring and supplying goods and services and for using property," which includes the Wage Mandate. (*Id.* at 10) (internal quotation marks omitted) (quoting 40 U.S.C. §§ 101, 121). In response, Plaintiffs offer a more limited view of the President's authority under the Procurement Act. (Dkt. No. 49 at 13–30). Specifically, Plaintiffs argue that the Procurement Act exists primarily as a means to "centralize and introduce flexibility into government contracting to remedy duplicative contracts and inefficiencies . . . not to provide the President with" broad regulatory power to set the minimum wage for the employees of federal contractors to $15 an hour. (*Id.* at 21).

The Court concludes that Sections 101 and 121 of the Procurement Act, read together, unambiguously limit the President's power to the supervisory role of buying and selling goods. In reaching this conclusion, the Court looks to the text, history, and structure of the Procurement Act. *Texas v. United States Env't. Prot. Agency*, 983 F.3d 826, 836 (5th Cir. 2020) (employing these same "traditional tools of construction").

Defendants first point to Section 121 of the Procurement Act as evidence of Congress' general grant of authority to the President to issue EO 14,026. (Dkt. No. 27

at 30).  Section 121 of the Procurement Act assigns general administrative functions.  *See*

40 U.S.C. § 121.  Relevant here, Section 121(a) provides:

> The President may prescribe policies and directives that the
> President considers necessary to carry out this subtitle. The
> policies must be consistent with this subtitle.

40 U.S.C. § 121(a).  Thus, an executive order made under the Procurement Act must

satisfy three requirements: it must be (1) a policy or directive, (2) "necessary to carry out

the subtitle", and (3) "consistent with this subtitle."  *Id.*  As a logical matter, the failure to

satisfy even one of these requirements obviates the need to consider the other

requirements.  And the Court finds that EO 14,026 is not consistent with subtitle I of Title

40.

The Procurement Act does not define "consistent."  The Oxford Dictionary defines

"consistent" as "[a]greeing or according in substance or form; congruous, compatible."

*Consistent*, Oxford English Dictionary (2nd ed. 1989).[16]  Thus, for EO 14,026 to remain

effective, raising the minimum wage of employees of federal contractors must be

"consistent," "agreeable," "congruous," or "compatible" with other sections of the

Procurement Act.  In making this determination, the Court will look to the Procurement

Act's operative sections and its history and structure as a whole.

A statute's historical context is an important tool of interpretation, as courts "often

look to history and purpose to divine the meaning of language."  *Gundy v. United States*,

---

[16]    The term "consistent" first appeared in 40 U.S.C. § 121(a) in 2002.  *See* Revision of Title
40, United States Code, "Public Buildings, Property, And Works," PL 107–217, August 21, 2002,
116 Stat 1062.

588 U.S. ____, ____, 139 S.Ct. 2116, 2126, 204 L.Ed.2d 522 (2019) (cleaned up).  Many courts have looked at the history of the Procurement Act when interpreting the Act.  *See, e.g., Kahn*, 618 F.2d at 789–92 ("In light of the imprecise definition of presidential authority under the [Procurement Act], it is useful to consider how the procurement power has been exercised under the Act."); *see also Kentucky*, 23 F.4th at 605–06 (considering the historical purpose of the statute); *Georgia*, 46 F.4th at 1292–95 (recounting the history of the Procurement Act as an interpretive tool).

The historical context of the Procurement Act supports this Court's conclusion that the President's authority is limited to the supervisory role of buying and selling of goods. That authority does not include a unilateral policy-making power to increase the minimum wage of employees of federal contractors.  In 1949, prior to the Procurement Act, there was no centralized authority responsible for procuring goods and services on behalf of the federal government.  *Georgia*, 46 F.4th at 1293.  This resulted in procurement-based inefficiencies; "[s]pecifically, given the lack of centralized coordination of procurement efforts, many agencies entered duplicative contracts supplying the same items and creating a massive [post-WWII] surplus."  *Kentucky*, 23 F.4th at 606.  As a result of these inefficiencies, Congress created the Hoover Commission, tasking it with improving the Federal Government's procurement process.  *Georgia*, 46 F.4th at 1293.  The Commission recommended centralizing this process.  *Id.*  Against this backdrop, Congress passed the Procurement Act, the purpose of which was to "consolidate[] several procurement-related agencies into the newly created General Services Administration" and to "vest[] supervisory authority in the President."  *Id.*  This background is helpful

15

context in determining the original public meaning of the statutory code responsible for the President's authority under the Procurement Act, which is now codified at 40 U.S.C. § 121(a).

Further, an analysis of the historical context includes how courts have interpreted a statute over time.  Since the Procurement Act's enactment, the Supreme Court has interpreted a president's grant of authority under Section 121(a) narrowly.  *See Chrysler Corp. v. Brown*, 441 U.S. 281, 304 n.34, 99 S.Ct. 1705, 1719 n.34, 60 L.Ed.2d 208 (1979).  For example, in *Chrysler*, the Court noted that there must be a "specific reference" in the Procurement Act as the source of authority upon which a president's executive order is based.  *Id.*  The Supreme Court reasoned that because none of the Procurement Act's statutory sections made a "specific reference to employment discrimination," *id.*, the President did not have the power under the Procurement Act to decree by executive order "a program to eliminate employment discrimination . . . by those who benefit from Government contracts."  *Id.* at 304–06, S.Ct. at 1719–20.  The text of the Procurement Act that delegates authority to the President, now codified at 40 U.S.C. § 121(a), has changed since the Supreme Court in *Chrysler* narrowly interpreted the President's authority under the Procurement Act.  *Compare* 40 U.S.C. § 486 (1949) *with* 40 U.S.C. § 121(a).[17]  But while the amended text is different, Congress expressly stated that the recodified version made

---

[17]   As originally drafted, Section 121(a) stated that the President "may prescribe such policies and directives, not inconsistent with the provisions of this Act, as he shall deem necessary to effectuate the provisions of this Act, which policies and directives shall govern the Administrator and executive agencies in carrying out their respective functions hereunder."  40 U.S.C. § 486 (1949).

"no substantive change" to the provision and merely cleaned up ambiguities, imperfections, superfluous provisions, etc. *See* Revisions of Title 40, United States Code, "Public Buildings, Property, and Works," Pub. L. No. 107–217, 116 Stat. 1062 (Aug. 21, 2002). Accordingly, *Chrysler Corp.*'s instruction that the President's power under the Procurement Act be accompanied by a "specific reference" is still persuasive to this Court in a statutory analysis.

In sum, the President's authority under the Procurement Act is codified under 40 U.S.C. § 121(a). The text states that the President may set policies that are "consistent" with the Procurement Act. *Id.* In determining "consistency," the Procurement Act's historical context shows that the primary purpose of the Act is to create an efficient system for federal agencies to buy and sell goods. As this purpose relates specifically to the President's policy-making power, the Procurement Act's historical context and early caselaw show that the President's authority under the Procurement Act is a supervisory role of "direct[ing] subordinate executive actors as they carry out [the Procurement Act's] specific provisions[.]" *Georgia*, 46 F.4th at 1295. Therefore, to determine whether President Biden had the authority to issue EO 14,026, this Court asks the following question: Is there a "specific reference" in sections of the Procurement Act that give President Biden the ability to raise, lower, or otherwise alter the wages of the employees of federal contractors? *See Chrysler Corp.*, 441 U.S. at 304 n.34, 99 S.Ct. at 1719 n.34. To answer this question, the Court turns to what Defendants argue is the specific reference in the Procurement Act—40 U.S.C. § 101.

Defendants point to 40 U.S.C. § 101 as a specific section of the Procurement Act that grants the President the authority to raise the minimum wage of the employees of federal contractors and subcontractors. (*See* Dkt. No. 27 at 17–33). Section 101 provides:

> The purpose of this subtitle is to provide the Federal Government with an economical and efficient system for the following activities:
>
> (1) Procuring and supplying property and nonpersonal services, and performing related functions including contracting, inspection, storage, issue, setting specifications, identification and classification, transportation and traffic management, establishment of pools or systems for transportation of Government personnel and property by motor vehicle within specific areas, management of public utility services, repairing and converting, establishment of inventory levels, establishment of forms and procedures, and representation before federal and state regulatory bodies.
>
> (2) Using available property.
>
> (3) Disposing of surplus property.
>
> (4) Records management.

40 U.S.C. § 101.

As a threshold matter, Section 101 likely cannot be used as a "specific reference" to support EO 14,026 because it is the Procurement Act's purpose clause. Typically, a statute's generalized purpose clause, while potentially useful in construing enumerated powers, is not itself an operative provision and cannot override an operative provision. *Sturgeon v. Frost*, 577 U.S. ____, ____, 139 S.Ct. 1066, 1086, 203 L.Ed.2d 453 (2019). Two federal courts of appeals have applied this reasoning specifically to the Procurement Act in holding that Section 101 is *not* a substantive grant of authority upon which the President may rely. *Kentucky*, 23 F.4th at 604; *Georgia*, 46 F.4th at 1298. The Court agrees

and finds that Defendants cannot point to Section 101 as statutory support for EO 14,026's Wage Mandate.

Even if the Court were to adopt Defendants' interpretation of Section 101 as a vast grant of policy-making authority, it would conflict with the overall purpose of the statute, as shown by the Procurement Act's operative sections. *See Georgia*, 46 F.4th at 1298. The operative provisions of the Procurement Act provide context in interpreting the parameters of Section 101, which memorializes the purpose of the Procurement Act. Congress set out the Procurement Act's general grant of procurement power in division C of subtitle I of Title 41. *See* 41 U.S.C. § 3301 *et seq.* The Procurement Act's framework operates to "obtain full and open competition" using "competitive procedures" in "fulfill[ing] the Federal Government's [procurement] requirements." *Id.* § 3301. To this end, an agency soliciting a procurement agreement for property or services must "specify its needs" and "develop specifications in the manner necessary to obtain full and open competition with due regard to the nature of the property or services to be acquired." *Id.* § 3306(a)(1). In specifying its needs, an agency may set certain "function[al]," "performance," or "design" requirements. *See* § 3306(a)(3).[18] In addition, in evaluating

---

[18]   Section 3306(a)(3) provides:

> (3) **Types of specifications.**—For the purposes of paragraphs (1) and (2), the type of specification included in a solicitation shall depend on the nature of the needs of the executive agency and the market available to satisfy those needs. Subject to those needs, specifications may be stated in terms of—
>
> (A) function, so that a variety of products or services may qualify;

(continue)

19

bids, an agency must establish "evaluation factors and subfactors, including the *quality* of the *product* or *services* to be provided."  *Id.* § 3306(c)(1)(A) (emphasis added).  With respect to quantity, the Procurement Act enables agencies to set their own procurement-related evaluation factors, so long as these factors "will result in the total cost and unit cost most advantageous to the Federal Government" and the resulting quantity "does not exceed the quantity reasonably expected to be required by the agency."  *Id.* § 3310(a).

These operative sections, specifically Section 3306(a)(3), paint a clearer picture of the Procurement Act's purpose.  The Procurement Act "establishes a framework through which agencies can articulate *specific, output-related standards* to ensure that acquisitions have the features they want."  *Georgia*, 46 F.4th at 1295 (emphasis added).  In other words, the Procurement Act provides a relatively hands-off framework that enables agencies to determine for themselves the quantity and quality of items to procure on behalf of the federal government.  It does not confer authority for the President to decree broad employment rules.  Interpreting Sections 101 and 121(a) as allowing the President to unilaterally set the minimum wage for the employees of federal contractors and subcontractors is inconsistent with the operative sections of the Procurement Act.

Contrast the Procurement Act's text, history, and structure with two federal statutes in which Congress unambiguously enables an agency to set wages.  For example,

---

> (B) performance, including specifications of the range of acceptable characteristics or of the minimum acceptable standards; or
>
> (C) design requirements.

41 U.S.C. § 3306.

Congress, in both the Davis Bacon Act and the Walsh-Healey Public Contracts Act, expressly gave the Secretary of Labor limited power to tailor the minimum wage of certain classes of federal contractors based upon similar work undertaken in the specific state in which federal contractors work. *See* 40 U.S.C. § 3142(b) ("The minimum wages shall be based on the wages the Secretary of Labor determines to be prevailing for the corresponding classes of laborers and mechanics employed on projects of a character similar to the contract work in the civil subdivision of the State in which the work is to be performed, or in the District of Columbia if the work is to be performed there."); 41 U.S.C. § 6502(1) ("All individuals employed by the contractor in the manufacture or furnishing of materials, supplies, articles, or equipment under the contract will be paid, without subsequent deduction or rebate on any account, not less than the prevailing minimum wages, as determined by the Secretary[.]"). This limited delegation of authority to the Secretary of Labor is vastly different than the authority President Biden claims to unilaterally raise the wages of employees of federal contractors and subcontractors without tailoring it to the specific classes of laborers or state in which the work is to be performed. *See* 40 U.S.C. § 3142(b). It also demonstrates that Congress knew how to delegate this wage-setting authority and reinforces the conclusion that the Procurement Act did no such thing with respect to the President.

The Procurement Act's text, history, and purpose do not offer the President broad policy-making authority to set the minimum wage of certain employees of federal contractors and subcontractors. There is no specific reference in the Procurement Act authorizing this broad policy-making power. *See Louisiana*, 55 F.4th at 1032 ("No such

provision exists in the Procurement Act to justify this intrusive command."). The Procurement Act's history and purpose likewise do not authorize this power. Instead, the Procurement Act's text, history, purpose and structure limit the President to a supervisory role in policy implementation rather than a unilateral, broad policy-making power to set a minimum wage.[19]

### 2.    The Major Questions Doctrine

This Court engaged in a statutory analysis and found that Sections 101 and 121 of the Procurement Act do not enable the President to set the minimum wage for employees of federal contractors and subcontractors. Normally, that would be the end of the analysis. But because the Fifth Circuit has recently applied the major questions doctrine to a Procurement Act case, the Court will do so as well. *See Louisiana*, 55 F.4th at 1029–31, 1031 n.40.

The Parties dispute whether the major questions doctrine applies to this case. At its simplest, the major questions doctrine requires Congress "to speak clearly when authorizing an agency to exercise powers of vast economic and political significance[.]"

---

[19]    It is worth noting that Defendants here, in arguing that Sections 101 and 121 of the Procurement Act grant the President this broad power, have advanced an *identical* argument to what the Sixth and Eleventh Circuits rejected, albeit in the vaccine context. *See Kentucky*, 23 F.4th at 604; *Georgia*, 46 F.4th at 1298. Both courts had harsh words for the Government's argument. In the Sixth Circuit's words, "The government itself offers virtually no textual analysis, which is unsurprising given that the text undermines its position." *See Kentucky*, 23 F.4th at 604; *see also id.* at 603 ("We reproduce [the statutory] language in full below because it is, ironically, likely the best evidence against the government's position." The Eleventh Circuit is equally as critical by stating that the Government's reading of the Procurement Act "rests on an *upside-down* view of the statutory scheme—that Congress has granted the President complete authority to control the federal contracting process in a way he thinks is economical and efficient, subject only to certain statutory limitations. The statute's language does not support this reading." *Georgia*, 46 F.4th at 1298 (emphasis added).

*Louisiana*, 55 F.4th at 1029 (quoting *Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., Occupational Safety & Health Admin.*, ____ U.S. ____, ____, 142 S.Ct. 661, 665, 211 L.Ed.2d 448 (2022)). And the Fifth Circuit has held that the major questions doctrine acts as more than just a limitation on agencies, it also "serves as a bound on Presidential authority." *Id.* Relying mostly upon *West Virginia v. EPA*, 597 U.S. ____, 142 S.Ct. 2587, 213 L.Ed.2d 896 (2022), Plaintiffs assert that EO 14,026 presents an issue of vast economic and political significance, and therefore clear congressional authorization for EO 14,026 is required. (*See* Dkt. No. 49 at 24–30). In response, Defendants assert that EO 14,026 does not present an issue of vast economic and political significance because EO 14,026 is just a slight increase to wages compared to what was promulgated by a 2014 Executive Order, and therefore clear congressional authorization is not required. (*See* Dkt. No. 27 at 29–33). The Court agrees with Plaintiffs.

When the executive branch "claims to discover in a long-extant statute an unheralded power to regulate 'a significant portion of the American economy,'" courts "typically greet its announcement with a measure of skepticism." *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324, 134 S.Ct. 2427, 2444, 189 L.Ed.2d 372 (2014) (quoting *FDA. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159, 120 S.Ct. 1291, 1315, 146 L.Ed.2d 121 (2000)). In these cases, courts "expect Congress to speak clearly if it wishes to assign to an agency decisions of vast 'economic and political significance.'" *Id.* (quoting *Brown & Williamson Tobacco Corp.*, 529 U.S. at 159, 120 S.Ct. at 1315). In simpler terms, an agency "must point to 'clear congressional authorization' for the power it claims." *West Virginia*, 597 U.S. at ____, 142 S.Ct. at 2609 (quoting *Util. Air. Regul. Grp.*, 573 U.S. at 324, 134 S.Ct. at 2444).

23

This is because "[e]xtraordinary grants of regulatory authority are rarely accomplished through 'modest words,' 'vague terms,' or 'subtle device[s].'" *Id.* (quoting *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468, 121 S.Ct. 903, 910, 149 L.Ed.2d 1 (2001)) (alteration in original). "Nor does Congress typically use oblique or elliptical language to empower an agency to make a 'radical or fundamental change' to a statutory scheme." *Id.* (quoting *MCI Telecomms. Corp. v. Am. Telephone & Telegraph Co.*, 512 U.S. 218, 229, 114 S.Ct. 2223, 2231, 129 L.Ed.2d 182 (1994)).

In applying the major questions doctrine, the Court will first discuss why EO 14,026 has vast economic and political significance, and then discuss how, by failing to speak clearly, Congress has not authorized the President to raise the minimum wage paid by federal contractors and subcontractors to its employees.

### a.   Vast Economic and Political Significance

In determining whether EO 14,026 is a major question, the first inquiry is whether EO 14,026 has "vast economic and political significance." A previous executive order issued under the Procurement Act is useful in making this determination—EO 14,042. In EO 14,042, the President directed that, under the authority vested in him by the Procurement Act, federal contractors must "provide adequate COVID-19 safeguards to their workers performing on or in connection with a Federal Government contract[.]" *Ensuring Adequate COVID Safety Protocols for Federal Contractors*, 86 Fed. Reg. 50,985 (Sept. 14, 2021). In addition, EO 14,042 mandated that federal contractors must comply with any future guidance "published by the Safer Federal Worker Task Force" and approved by the OMB as "promot[ing] economy and efficiency in Federal contracting." *Id.* at

50,985.  Of note, relying on EO 14,042 as its authority, a future guidance required "COVID-19 vaccination of covered contractor employees, except in limited circumstances where an employee is legally entitled to an accommodation."  Safer Federal Workforce Task Force, *COVID-19 Workplace Safety: Guidance for Federal Contractors and Subcontractors* (Sept. 24, 2021), https://perma.cc/2R27-9J4U.  This has been commonly referred to as the "federal contractor vaccine mandate" in cases discussing EO 14,042.

The Fifth, Sixth, and Eleventh Circuits agree that the federal contractor vaccine mandate involved a major question, implicating the major questions doctrine.  *See Louisiana*, 55 F.4th at 1028; *Kentucky*, 23 F.4th at 606–07; *Georgia*, 46 F.4th at 1295–96.  These courts determined that the federal contractor vaccine mandate involved a major question because (1) federal contractors comprise twenty percent of the Nation's workforce, and (2) the vaccine mandate fell outside the statute's past uses.  *See, e.g., Louisiana*, 55 F.4th at 1028–30.  Up until that point, the Procurement Act had been limited to "establish[ing] a framework through which agencies can articulate specific, output-related standards to ensure that acquisitions have the features they want," *Georgia*, 46 F.4th at 1295, with the overall goal of "achieving 'full and open competition' in the procurement process."  *Id.* at 1297 (quoting 41 U.S.C § 3301).

Defendants argue that this case does not implicate the major questions doctrine in part because EO 14,026 does not sweep as broadly as the federal contractor vaccine mandate since EO 14,026 only affects the wages of certain employees of federal contractors and subcontractors who are currently paid below $15 dollars an hour.  (Dkt. No. 58 at 18–20).  The Court disagrees.

25

Section C of EO 14,026's implementing regulations discusses EO 14,026's positive and negative impacts.  86 Fed. Reg. at 67,204–17.  As to some of EO 14,026's costs, the Department states that there will be regulatory familiarization costs, implementation costs, and transfer payments.  *Id.*  Each one of these costs is significant.

With respect to regulatory familiarization costs, the Department estimates that federal contractors will incur $13.4 million in the first year of "regulatory familiarization costs" as a result of EO 14,026.  *Id.* at 67,205.  Regarding implementation costs, the Department estimates that federal contractors will incur $3.8 million in the first year implementing EO 14,026's rules.  *Id.*  And as to transfer payments, the Department estimates that federal contractors will incur $1.7 *billion* in *annual* transfer payments as a result of EO 14,026.  *Id.* at 67,208.

The last cost, $1.7 billion in annual transfer payments as a result of EO 14,026, warrants additional discussion.  In reaching its $1.7 billion transfer cost amount, the Department estimates that only 327,300 workers will see an increase in their wages because only 327,300 employees of federal contractors are paid below $15 an hour.  *Id.* at 67,200.  Some commentators criticize the Department's estimated $1.7 billion in annual transfer payments as understating the actual costs because "the Department excluded spillover costs."  *Id.* at 67,209.  More specifically, commentors criticize the Department's 327,300 covered-workers estimate as underrepresenting EO 14,026's reach because (1) those currently being paid over $15 on covered contracts and (2) those working on non-covered contracts (whether paid below, at, or above $15 dollars) will likely see a pay

increase as a result of EO 14,026.  *Id.* at 67,210–21.  These are commonly referred to as "spillover effects" in EO 14,026's implementing regulations.  *Id.*

And these spillover effects are significant.  As to the number of workers previously paid over $15 an hour who may see an increase in wages as a result of EO 14,026, the commentators cite studies showing that increasing the minimum wage can result in cost of labor increases for "up to a third of the work force *other than minimum wage earners*," *id.* at 67211 (quoting Loc H. Nguyen, *The Minimum Wage Increase: Will This Social Innovation Backfire?*, 63 Soc. Work 367, 367–69 (2018)) (emphasis added), or for "up to about the 30th percentile of wage distributions."  *Id.* (quoting Arindrajit Dube & Attila Lindner, *City Limits: What Do Local-Area Minimum Wage Do?*, 35 J. of Econ. Persp. 27–50 (2021).  Interestingly, the Department agreed that "there will likely be wage increases for some workers earning above $15 per hour or working on non-covered contracts" yet "the department [did] not quantif[y] this change"—that is, the Department did not change its estimate as to the estimated $17 billion in transfer payments over ten years based upon only 327,300 covered workers paid below $15 an hour.  *Id.* at 67,211.  At least $17 billion in transfer payments alone, which does not account for two spillover effects, significantly affects the economy.

After reviewing EO 14,026's implementing regulations and in determining whether EO 14,026 implicates the major questions doctrine, this Court believes that EO 14,026 is similar to the federal vaccine mandate.  EO 14,026 commands federal contractors to comply with a heightened requirement found nowhere else in the law.  This heightened requirement, which for some federal contractors is double the minimum

wage, does not have broad support in the regulations and will cost federal contractors and the United States billions of dollars.  For these reasons, the Court holds that EO 14,026 implicates the major questions doctrine.  As such, to find that Congress authorized EO 14,026, Congress must have "clearly spoken."

b.     Speak Clearly

The Parties dispute whether Congress, via the Procurement Act, spoke clearly in granting the President the power to unilaterally raise the minimum wage of the employees of federal contractors.  (*See generally* Dkt. No. 27); (Dkt. No. 49 at 13–30).  Since the Court has concluded that neither the text, history, purpose, nor structure of the Procurement Act authorizes EO 14,026, the Court likewise holds that Congress has not "clearly spoken" in authorizing it.  Therefore, the Court finds that the President acted *ultra vires* and exceeded his authority by issuing EO 14,026.

**B.     COUNTS II & III: CLAIMS UNDER THE ADMINISTRATIVE PROCEDURES ACT**

In Counts II and III of their Complaint, Plaintiffs allege that the implementation of the Wage Mandate—EO 14,026 and the Final Rule—exceeds the Department of Labor's authority under the APA and is arbitrary and capricious in violation of the APA.  (Dkt. No. 1 at 24–26) (citing 5 U.S.C. §§ 706(2)(A) & (C)).  Defendants respond that the Wage Mandate is not reviewable under the APA.  (Dkt. No. 27 at 33–36); (Dkt. No. 58 at 22–30). Plaintiffs disagree arguing that the Final Rule is reviewable under the APA,[20] and that by implementing both EO 14,026 and Final Rule, the Department of Labor acted arbitrarily

---

[20]    Plaintiffs do not challenge Defendants' argument that the EO is not reviewable under the APA.

and capriciously.  (Dkt. No. 49 at 34–42); (Dkt. No. 62 at 12–14).  For the following reasons, the Court finds that neither the EO nor the Final Rule are reviewable under the APA.

### 1.     Reviewability of Executive Order 14,026

It is well-settled that presidential action is not subject to review under the APA. *Franklin v. Massachusetts*, 505 U.S. 788, 801, 112 S.Ct. 2767, 2775–76, 120 L.Ed.2d 636 (1992) ("As the APA does not expressly allow review of the President's actions, we must presume that his actions are not subject to its requirements."); *Tulare Cnty. v. Bush*, 306 F.3d 1138, 1143 (D.C. Cir. 2002) ("Presidential actions, of course, are not subject to APA review[.]") (citing *Franklin*, 505 U.S. at 800–01, 112 S.Ct. at 2775–76).  The Supreme Court has reasoned that because the President "is not an agency within the meaning of the [APA]," there can be no judicial review of "final agency action" as prescribed in the APA. *Franklin*, 505 U.S. at 796, 112 S.Ct. at 2773; *see also Dalton v. Specter*, 511 U.S. 462, 468, 114 S.Ct. 1719, 1723, 128 L.E.2d 497 (1994); *Alexander v. Trump*, 753 F. App'x 201, 206 (5th Cir. 2018) ("[T]he President is not an 'agency' under the APA.").

An executive order is a presidential action, not an agency action.  The APA does not provide a cause of action for challenging executive orders.  *See, e.g., Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1326 (D.C. Cir 1996) (stating that "appellants' challenge is directed at the *President's* statutory authority to issue the Executive Order" and "[g]iven the nature of appellants' challenge, there does not exist the necessary 'agency action' that triggers the APA's waiver of sovereign immunity") (emphasis in original); *Louisiana v. Biden*, 622 F.Supp.3d 267, 288 (W.D. La. Aug. 18, 2022) ("[An executive order] cannot be reviewed under the APA because the President is not an agency.") (citing *Dalton*, 511 U.S.

at 469, 114 S.Ct. at 1724). Accordingly, Plaintiffs' challenges to EO 14,026 under the APA are not reviewable because EO 14,026 is presidential action immune from APA review.

### 2. Final Rule

Defendants argue that the Final Rule is similarly unreviewable under the APA "to the extent it simply adopts discretionary choices made by the President, in the exercise of authority granted to him by Congress through the [Procurement Act]." (Dkt. No. 27 at 34). Plaintiffs contend that the Department of Labor's actions in issuing the Final Rule "are not shielded from judicial review [under the APA] merely because they were implementing the President's Executive Order." (Dkt. No. 49 at 34). Few courts have directly decided whether "the bar on APA review of actions by the President extend to the actions of agencies when they act under a delegation of presidential authority[.]" *Ancient Coin Collectors Guild v. U.S. Customs & Border Prot., Dep't of Homeland Sec.*, 801 F.Supp.2d 383, 402 (D. Md. 2011), *aff'd*, 698 F.3d 171 (4th Cir. 2012).

Courts are split on whether the President's immunity from APA review established by the Supreme Court in *Franklin* extends only to instances where "the President has final constitutional or statutory responsibility for the *final step* necessary for the agency action," *Pub. Citizen v. U.S. Trade Representative*, 5 F.3d 549, 552 (D.C. Cir. 1993) (emphasis added), or whether it applies in circumstances where the challenged action "entails any exercise of discretionary authority retained by the President." *Detroit Int'l Bridge Co. v. Gov't of Canada*, 189 F.Supp.3d 85, 98 (D.D.C. 2016) (subsequent case history omitted); *Jensen v. Nat'l Marine Fisheries Servs. (NOAA)*, 512 F.2d 1189, 1191 (9th Cir. 1975)

30

("[T]he Secretary's actions are those of the President, and therefore by the terms of the APA the approval of the regulation at issue here is not reviewable.").[21]

The Fifth Circuit has not taken a position in this debate, and this Court declines to do so.  Since the Court has already determined that EO 14,026 exceeds the President's authority under the Procurement Act, it need not reach the question of whether the implementation of EO 14,026 under the Final Rule is reviewable under the APA.

## C.     COUNT IV: CLAIM UNDER THE NON-DELEGATION DOCTRINE

In Count IV of their Complaint, Plaintiffs argue that if the Procurement Act's delegation of authority is so broad that it authorizes the President "to unilaterally impose" EO 14,026, then the Procurement Act violates the non-delegation doctrine because "it lacks an 'intelligible principle' to guide the President's actions."  (Dkt. No. 1 at 26–28); (*see also id.* at 18–19).  Plaintiffs also argue that if Congress had delegated this authority to the President under the Procurement Act, Congress failed to "articulate an intelligible principle authorizing the President to delegate legislative judgment to the Secretary of the Department of Labor."  (*Id.* at 27).  Defendants respond that there are "no legitimate non-delegation concerns," (Dkt. No. 27 at 31), because the Procurement Act "plainly supplies an intelligible principle to guide the President's discretion in administering the statute," and that "every court of appeals that has decided the question has ruled" as much.  (*Id.* at 32) (citations omitted).

---

[21]   *See* William Powell, *Policing Executive Teamwork: Rescuing the APA from Presidential Administration*, 85 Mo. L. Rev. 71, 103–116 (2020).

The Court need not decide this issue because it has already held that the President exceeded his authority under the Procurement Act by issuing EO 14,026. So this Court will avoid ruling on the non-delegation issue because a court should "avoid finding constitutional problems where unnecessary." *Louisiana,* 55 F.4th at 1028 (citing *Harmon v. Brucker*, 355 U.S. 579, 581, 78 S.Ct. 433, 435, 2 L.Ed.2d 503 (1958)).

### D.   COUNT V: CLAIM UNDER THE SPENDING CLAUSE

In Count V of their Complaint, Plaintiffs allege that the Wage Mandate is an unconstitutional exercise of Congress' spending power. (Dkt. No. 1 at 28–29). Plaintiffs argue that the Wage Mandate violates the Supreme Court's holding in *Pennhurst State School & Hospital v. Halderman*, 451 U.S. 1, 17, 101 S.Ct. 1531, 1540, 67 L.Ed.2d 694 (1981), which required that conditions imposed "on the grant of federal moneys" must be expressed by Congress "unambiguously." (*See* Dkt. No. 1 at 28–29). Plaintiffs argue that because the Procurement Act "fails to provide clear notice to States that acceptance of federal contracting funds will require them to pay a minimum wage set by the federal government," EO 14,026's Wage Mandate imposes impermissible conditions. (*Id.* at 29).

As with the non-delegation doctrine, the Court need not resolve this issue because it has already held that the President exceeded his authority under the Procurement Act by issuing EO 14,026. *See Louisiana*, 55 F.4th at 1028 (citing *Harmon*, 355 U.S. at 581, 78 S.Ct. at 435).

## V.   INJUNCTIVE RELIEF

Plaintiffs ask the Court to enjoin the enforcement of EO 14,026 and the Final Rule. (Dkt. No. 1 at 24). "According to well-established principles of equity, a plaintiff seeking

a permanent injunction must satisfy a four-factor test before a court may grant such relief." *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391, 126 S.Ct. 1837, 1839, 164 L.Ed.2d 641 (2006). Those factors are: "(1) that it has succeeded on the merits; (2) that a failure to grant the injunction will result in irreparable injury; (3) that said injury outweighs any damage that the injunction will cause the opposing party; and (4) that the injunction will not disserve the public interest." *Valentine v. Collier*, 993 F.3d 270, 280 (5th Cir. 2021); *see also eBay*, 547 U.S. at 391, 126 S.Ct. at 1839. Plaintiffs have demonstrated success on the merits, *see supra* Part IV.A., thus establishing the first permanent-injunction factor.

Turning to the second factor, the Court finds that a failure to grant the injunction will result in irreparable injury. "In the Fifth Circuit, it is 'well-established' that a harm is considered 'irreparable only if it cannot be undone through monetary damages.'" *Nat'l Ass'n for Gun Rights, Inc. v. Garland*, No. 4:23-CV-00830, 2023 WL 5610293, at *8 (N.D. Tex. Aug. 30, 2023) (quoting *Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 279 (5th Cir. 2012)). "A showing of economic loss is usually insufficient to establish irreparable harm because damages are typically recoverable at the conclusion of litigation." *Id.* (citing *Janvey v. Alguire*, 647 F.3d 585, 599–601 (5th Cir. 2011)). But "where costs are not recoverable because the government-defendant enjoys sovereign immunity from monetary damages, irreparable harm is generally satisfied." *Id.* (citing *Wages & White Lions Invs., L.L.C. v. FDA*, 16 F.4th 1130, 1142 (5th Cir. 2021)); *see also Texas v. EPA*, 829 F.3d 405, 433–34 (5th Cir. 2016). Indeed, as Justice Scalia recognized in *Thunder Basin Coal Company v. Reich*, "complying with . . . regulation[s] later held invalid almost *always* produces the irreparable harm of nonrecoverable compliance costs[.]" 510 U.S. 200, 220–

21, 114 S.Ct. 771, 775, 127 L.Ed.2d (1994) (Scalia, J., concurring in part in the judgment) (emphasis in the original).

Here, Plaintiffs have shown an irreparable injury because they have suffered non-recoverable compliance costs.  Specifically, complying with the now-invalid EO 14,026 and the Final Rule since January 2022 has required the Plaintiffs to pay the $15 hourly wage to certain employees that would not otherwise have received such a rate. Accordingly, the second permanent-injunction factor is satisfied.

As to the third and fourth factors, which merge when the Government is a party, *see Nken v. Holder*, 556 U.S. 418, 435, 129 S.Ct. 1749, 1764, 173 L.Ed.2d 550 (2009), the Court finds that they weigh in Plaintiffs' favor.  "A court must 'pay particular regard for the public consequences in employing the extraordinary remedy of injunction.'"  *Nat'l Ass'n for Gun Rights*, 2023 WL 5610293, at *10 (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24, 129 S.Ct. 365, 376–77, 172 L.Ed.2d 249 (2008)).  Here, Defendants have no interest in the perpetuation of an unlawful executive order and Final Rule.  *Cf. League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) ("There is generally no public interest in the perpetuation of unlawful agency action.").  Rather, there is an interest in having government officials and agencies abide by the law as it exists.  *Cf. Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994) (noting the "public interest in having government agencies abide by the federal laws that govern their existence and operations").  The Court thus finds the third and fourth factors satisfied.

Although injunctive relief is warranted, the Court declines to grant it on a nationwide basis.  "Equitable remedies, like remedies in general, are meant to redress

the injuries sustained by a particular plaintiff in a particular lawsuit." *Dep't of Homeland Sec. v. New York*, ____ U.S. ____, 140 S.Ct. 599, 600, 206 L.Ed.2d 115 (2020) (Gorsuch, J., concurring).  To this end, "[w]hen a district court orders the government not to enforce a rule against the plaintiffs in the case before it, the court redresses the injury that gives rise to its jurisdiction in the first place." *Id.* (Gorsuch, J., concurring).  "But when a court goes further than that, ordering the government to take (or not take) some action with respect to those who are strangers to the suit, it is hard to see how the court could still be acting in the judicial role of resolving cases and controversies." *Id.* (Gorsuch, J., concurring).

Here, two district courts outside the Fifth Circuit, *Bradford v. U.S. Dep't of Lab.*, 582 F.Supp.3d 819, 833–41 (D. Colo. 2022), and *Arizona v. Walsh*, No. 3:22-CV-00213, 2023 WL 120966, at *5–9 (D. Ariz. Jan. 6, 2023), have declared EO 14,026 to be lawful.  While the Court disagrees with both *Braford* and *Walsh*,[22] extending relief nationwide would result in this Court encroaching upon the jurisdiction of other courts who have ruled on this issue.[23]

---

[22] The Court notes that *Bradford* and *Walsh*—which take direction from the Tenth and Ninth Circuits, respectively—embrace the close-nexus test. *See Bradford*, 582 F.Supp.3d at 838; *Kahn*, 2023 WL 120966 at *5.  By contrast, the Sixth and Eleventh Circuits have rejected that approach in favor of a more exacting statutory analysis. While not affirmatively disavowing the D.C. Circuit's close-nexus test, the Fifth Circuit has seemingly embraced the Sixth and Eleventh Circuits' approach in requiring more than a close nexus.  *Louisiana*, 55 F.4th at 1026 n.25.  This Court has followed the Fifth Circuit's direction.

[23] At least one Supreme Court Justice notes that, differing viewpoints by different courts on the law is a *feature*—not a bug—of the Judiciary. *See Dep't of Homeland Sec.*, ____ U.S. ____, 140 S.Ct. 599, 600, 206 L.Ed.2d 115 (2020) (Gorsuch, J., concurring) (stating the judicial "system encourages multiple judges and multiple circuits to weigh in only after careful deliberation, a process that permits the airing of competing views that aids this Court's own decisionmaking process").

As such, the Court declines to issue nationwide injunctive relief.  Accordingly, the Court will grant the narrowest injunction possible that will afford Plaintiffs full relief as to Count I. The Court grants injunctive relief to only the Plaintiffs of this suit.

VI.   **CONCLUSION**

For the following reasons, the Court (1) **GRANTS IN PART** and **DENIES IN PART** Defendants' Motion to Dismiss, or in the alternative, Motion for Summary Judgment, (Dkt. No. 27), and (2) **GRANTS IN PART** and **DENIES IN PART** Plaintiffs' Cross-Motion Summary Judgment, (Dkt. No. 49).  The Court finds that Plaintiffs have proven that they are entitled to judgment as a matter of law as to Count I of their Complaint.  The Court finds that Defendants have shown that they are entitled to partial judgment as a matter of law as to Count II and III of Plaintiffs' Complaint as it relates to the Executive Order.  The Court declines to reach Count III as it relates to the Final Rule, as well as Counts IV and V of Plaintiffs' Complaint.

The Court **ENJOINS** Defendants from enforcing Executive Order 14,026 and the Final Rule against the States of Texas, Louisiana, and Mississippi and their agencies.  The Court **DENIES** all other requested relief.  The Court will enter a final judgment, including a seven-day administrative stay, by separate order.

It is SO ORDERED.

Signed on September 26, 2023.

_____
**DREW B. TIPTON**
**UNITED STATES DISTRICT JUDGE**